WEINSTEIN ENTERPRISES, INC.,
Defendant Below, Appellant,

v.

George D. ORLOFF, Plaintiff
Below, Appellee.

No. 257, 2004.

Supreme Court of Delaware.

Submitted: Jan. 7, 2005.
Decided: March 21, 2005.

William O. LaMotte, III (argued), Kenneth J. Nachbar, James G. McMillan, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for appellant.

Stephen E. Jenkins (argued), Steven T. Margolin, Lauren E. Maguire, Ashby & Geddes, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

HOLLAND, Justice:

This is an appeal from a final judgment entered by the Court of Chancery. The plaintiff-appellee, George D. Orloff, filed a complaint pursuant to section 220 of Title 8 of the Delaware Code ("section 220") seeking inspection of the books and records of Weinstein Enterprises, Inc. ("Weinstein") and the production of certain documents in the possession of J.W. Mays, Inc., a publicly held New York corporation ("Mays") of which Weinstein is a 45.16% stockholder.

The Court of Chancery found that Mays is a "subsidiary" of Weinstein for purposes of section 220(a)(3). Weinstein was ordered to attempt to produce a broad range of documents in the possession of Mays. Weinstein advised Mays of that order. A Special Committee of the Mays Board determined that production of the requested documents was not in Mays' interest. The Court of Chancery then issued an order compelling the production of the Mays documents by Weinstein.

In this appeal, Weinstein contends that the Court of Chancery misconstrued the 2003 amendment to Del.Code Ann. tit. 8, § 220 relating to the rights of a stockhold-

er of a Delaware corporation to inspect the books and records of a "subsidiary" of that Delaware corporation. We have concluded that Weinstein's position is correct. Accordingly, the judgment of the Court of Chancery must be reversed.

The Court of Chancery correctly held that Mays was a "subsidiary" of Weinstein for purposes of section 220(a)(3), because the record reflects that Weinstein was the controlling stockholder of Mays. Therefore, Orloff was entitled to inspect Mays' documents that were in Weinstein's "actual possession" pursuant to section 220(b)(2)a. But, because Weinstein could not exercise the actual control over Mays that section 220(b)(2)b requires for Weinstein to produce the documents in the subsidiary's possession and control, Orloff was not entitled to inspect that latter category of documents.

### Facts [1]

Weinstein is a Delaware corporation engaged in the business of acquiring and holding rental properties for long-term value. Weinstein owns 23 properties, most of which are located in and around New York City. Outside New York City, Weinstein also owns an industrial property in West Virginia, a 32–story office building in Kansas City and a golf course property on Long Island.

In addition to its real property and its portfolio of other securities and cash, Weinstein owns 45.16% of the outstanding shares of J.W. Mays, Inc. ("Mays"), a publicly held New York corporation. Proprietary information relating to real property owned by Mays—not Weinstein—is the focus of this appeal.

Weinstein was founded in 1960 by Joe Weinstein, who also founded and operated Mays, and who contributed various parcels of real property to Weinstein Enterprises. Upon Joe Weinstein's death in 1963, Joe Weinstein's son-in-law, Max Shulman, became CEO of both Mays and Weinstein. In the early 1990's, Max Shulman's son, Lloyd Shulman, took over the leadership of both companies.

### Ownership of Weinstein

Until recently, Weinstein had continuously been a family-owned business. For many years, approximately 63% of the shares of Weinstein have been owned by Lloyd Shulman and his immediate family, and for over seven years, Lloyd Shulman has been President and CEO of Weinstein.

At the time this action was filed, slightly less than 34% of Weinstein's outstanding shares were held by plaintiff George Orloff and his immediate family. The Orloffs are cousins of the Shulmans. The remaining approximately 3% of the outstanding shares are held in various trusts. While this section 220 proceeding was pending, however, Orloff and his family sold just over 98% of their Weinstein shares to JW Acquisition, LLC ("JWA")—a competitor of Mays and Weinstein—while retaining less than 2%.

### Weinstein–Orloff Relationship

Lloyd Shulman is the grandson of Joe Weinstein, the founder of both Weinstein and Mays. George Orloff is Joe Weinstein's great-grandson and Mr. Shulman's cousin. The conflict between the Orloffs and the Shulmans dates to 1964, when George Orloff's grandmother unsuccessfully contested Joe Weinstein's will. The

1. Although the parties disagree about the extent of control that Weinstein is able to exercise over the books and records of Mays, the background facts are not in dispute. This factual recitation is taken primarily from the Appellant's Opening Brief and portions of the Appellee's Answering Brief.

shares of Weinstein currently owned by the Shulmans and the Orloffs devolved upon them through bequests rather than by acquisition.

## Mays' Business

Mays is a New York public corporation. It does no business in Delaware. Founded in 1924 and incorporated in 1927, Mays was originally in the business of owning and operating a chain of department stores with headquarters in Brooklyn, New York. By the early 1980's, Mays, like many similar department store chains, was no longer competitive. In 1981, Mays was reorganized pursuant to Chapter 11 of the Bankruptcy Code. It emerged from bankruptcy as a real estate company, leasing the ground floors of many of the former Mays stores for retail operations and, in some cases, renting the upper floors for office space or other commercial use. Mays is now engaged in the business of owning and managing those real estate properties.

## Mays' and Weinstein's Relationship

Mays is a public corporation whose financial statements are not consolidated with Weinstein's. Weinstein owns 45.15% of Mays' shares, and the Shulman family members and a foundation controlled by the Shulman family own an additional 11.27%. Approximately 20% of the stock of Mays is traded in the NASDAQ small cap market. Weinstein has historically maintained and increased its interest in Mays.

Two of Mays' directors are officers of Weinstein, but Mays has independent directors as well. The Court of Chancery made no finding that Mays' outside directors are either dominated or controlled by Weinstein or the Shulmans. Lloyd Shulman is CEO, President and Chief Operating Officer of Mays and is also CEO of Weinstein. Mr. Shulman's 85–year–old mother, Sylvia, is a director of both Weinstein and Mays. Ward N. Lyke, Jr., is Mays' Vice President—Management Information Systems and is also a part-time bookkeeper for Weinstein. Salvatore Cappuzzo is Weinstein's secretary and treasurer, and also serves without compensation as Mays' secretary. Mays and Weinstein retain the same outside accounting firm. Two of Mays' seven directors are also Weinstein directors. Lance Myers, a Mays director, serves as an attorney for both Mays and Weinstein. Another Mays director, Dean L. Ryder, is president of a one-branch bank located near Weinstein's headquarters and in which Weinstein is a significant depositor.[2]

## Mays' Document Production

While this action was pending in the Court of Chancery, the parties agreed to the production of documents in the possession of both Weinstein and Weinstein's

2. Orloff submits there are many other interconnections between Weinstein and Mays, and points, in particular, to three documents from the 1980's. The first is an October 22, 1984 letter from Lloyd Shulman's father, Max, who was then CEO of both companies, to Mr. Orloff's aunt. At that time, Weinstein owned only 34% of Mays' stock. Max Shulman informed Mr. Orloff's aunt that Weinstein had bought further Mays shares in the market "[t]o protect our control and investment in Mays against two groups trying to gain control of Mays for its Real Estate holdings ...." The second document is a related letter to all Weinstein stockholders saying that "in order to insure our control of J.W. Mays, Inc., your officers deemed it prudent and in the best interest of our Company to acquire, in the open market, additional blocks of shares of J.W. Mays, Inc." The third document is the minutes of a Weinstein board of directors meeting dated June 24, 1985. Weinstein agreed to provide $3 million in free collateral to support a loan that Mays was incurring. The stated reason for this action was the "very important financial stake [Weinstein has] in Mays."

wholly-owned operating subsidiaries. There was only one issue before the Court of Chancery: was Orloff entitled to Mays' documents that were in the possession and control of Mays? Orloff represented to the Court of Chancery that his purpose for seeking inspection of those Mays documents was "to value his shares [in Weinstein] and to be able to provide due diligence material to a prospective purchaser of those shares." Orloff also represented that he and "members of his immediate family had now entered into an agreement to sell approximately 90% of their shares" to a third party, JW Acquisition, LLC ("JWA"), subject to due diligence; and that Orloff needed the Mays documents to help JWA "understand the value of Mays' real estate assets" in connection with its due diligence regarding its purchase of Orloff's shares in Weinstein.

In response, Weinstein took the position that absent consent of the Mays board, it has no ability to cause the production of documents by Mays. According to Weinstein, Mays is a public company with an independent board of directors and it was for the Mays board to determine whether Mays' documents may be inspected by Orloff. In short, Weinstein argued, it does not exercise "control" of the affairs of Mays in any practical or realistic sense, and consequently, Mays cannot be a "subsidiary" of Weinstein under section 220(a)(3).

The Court of Chancery ruled that Orloff was entitled to inspect Mays' detailed records for the purpose of valuing his Weinstein shares for sale to a third party. The Court of Chancery ordered Weinstein to cause Mays to produce the documents that Orloff had requested:

> So, the necessary finding is that Weinstein Enterprises exercises control over the affairs of J.W. Mays directly or indirectly. . . .

[I]ssuing an order under this section directed to Weinstein Enterprises requiring it to produce documents from J.W. Mays could present some awkward issues for Weinstein Enterprises, but I'm satisfied that either the powers of this Court [of Chancery] to issue process for the purpose of influencing its judgments, or, if necessary, rights that Weinstein Enterprises possesses under New York law to seek books and records from J.W. Mays is sufficient to—or would be sufficient to secure compliance with an order under this section.

In denying Weinstein's motion for reargument, the Court of Chancery stated:

> If anything, further examination of the statute on further reflection leads me to believe that while the act is not perfectly drafted, it quite plainly contemplated situations in which a subsidiary at issue would be a less than a wholly owned subsidiary and also a subsidiary that wouldn't be regarded in the law as merely an alter ego of the parent.
>
> While I fully understand that it raises all kinds of complications and introduces into 220 actions issues that perhaps we are not used to addressing, I believe that was the intention of the General Assembly when it amended the statute. That may prove to be unworkable.
>
> . . .
>
> I am quite clear that the statute was intended to confer on this Court the power to enter an order that requires the production of Mays documents. Now, I say that recognizing that as a practical matter Weinstein may not be able to cause Mays to produce the documents without taking extraordinary steps. Although Weinstein may not be able to, I think the Court has the power to do so by issuing another process.

Weinstein notified Mays of the Court of Chancery's ruling.

## Mays' Board Responds

Mays, which was not a party to the section 220 action, was advised of the Court of Chancery's ruling. In response to that advice, the Mays board of directors formed a Special Committee consisting of four outside directors of Mays and delegated to that committee the responsibility for determining what action, if any, Mays should take. The Special Committee, advised by outside counsel, determined that the disclosure of proprietary, confidential information of Mays, that was not otherwise available to its public stockholders, "would place Mays at a substantial competitive disadvantage and would be contrary to the best interests of Mays and its shareholders." The Special Committee, through counsel, advised Weinstein of its determination by letter dated June 8, 2004.[3]

## Stay Granted Pending Appeal

Weinstein filed a Motion to Stay pending Appeal. The Court of Chancery granted Weinstein's Motion to Stay, noting that "Mays is a separate legal entity with minority shareholders" and that "the fiduciary duties of the Mays directors do not run directly to Weinstein and Weinstein does not have the unfettered power to tell the Mays board of directors what to do."

## Section 220 Amended in 2003

█ The paradigm setting for the application of section 220 is a case where the plaintiff seeks to inspect the books and records of the corporation in which he or she owns stock. Section 220 is intended to provide to stockholders of Delaware corporations an economical and expeditious mechanism for the inspection of documents,[4] if such stockholders can demonstrate a valid purpose. Prior to the 2003 amendment to section 220, "stockholders of a parent corporation [were] not entitled to inspect a subsidiary's books and records, '[a]bsent a showing of fraud or that a subsidiary is in fact the mere alter ego of the parent ....' "[5] In 2003, however, section 220 was amended to provide for inspection of documents of a "subsidiary" of the corporation upon which the demand for inspection is made.

## The Statute Defines "Subsidiary"

The parties' dispute over the proper interpretation of the 2003 amendment to section 220 raises an issue of first impression. The term "subsidiary" is defined in the conjunctive:

"Subsidiary" means any entity directly or indirectly owned in whole or in part, by the corporation of which the stockholder is a stockholder *and* over the

---

**3.** Among the grounds for the Special Committee's determination were: 1) that JWA's principal, Alex Adjmi, and his affiliates, as well as other clients of Newmark, are direct competitors of Mays and, thus, that disclosure of Mays' confidential information to them would place Mays at a competitive disadvantage; 2) that "Adjmi has engaged in criminal conduct and has served time in federal prison after pleading guilty to charges of mail fraud and money laundering" and, therefore, "[t]here is no reasonable expectation that Adjmi or his associates would honor any order of confidentiality"; 3) that, because Mays is a public company traded on the NASDAQ small cap market, sufficient information for the valua-

tion of Mays' stock owned by Weinstein is already publicly available; 4) that Mays is "not subject to the jurisdiction of the Delaware courts" and "only Mays (or a court of appropriate jurisdiction in New York) should decide how [Mays' confidential] information should be disclosed."

**4.** *Brehm v. Eisner,* 746 A.2d 244, 267 (Del. 2000).

**5.** *Saito v. McKesson HBOC, Inc.,* 806 A.2d 113, 118 (Del.2002) (quoting *Skouras v. Admiralty Enter., Inc.,* 386 A.2d 674, 681 (Del.Ch. 1978)).

affairs of which the corporation directly or indirectly exercises control .... [6]

That statutory definition required the Court of Chancery to make a determination not only that Mays is "an entity directly or indirectly owned, in whole or in part" by Weinstein, but also that Weinstein exercises "control," directly or indirectly, "over the affairs" of Mays. There is no helpful legislative history [7] to inform our construction of the definition of "subsidiary" in section 220.

Weinstein submits that only one interpretation is consistent with section 220's overriding purpose, which is to provide for the inspection of corporate books and records in a timely fashion by a stockholder of a Delaware corporation. According to Weinstein, "subsidiary" must be defined to accomplish that purpose while simultaneously protecting the legitimate interests of subsidiary corporations in the confidentiality of their own documents. Weinstein and Orloff both agree that the 2003 amendment must be construed in a manner that is consistent with the *actual ability* of the parent corporation before the Court of Chancery to cause the subsidiary corporation that is not before the Court of Chancery to make its documents available for inspection.

Establishing that an entity is a "subsidiary" of the corporation that is before the Court of Chancery is a condition precedent to invoking the 2003 amendment to section 220. As in this case, usually the extent of the parent corporation's direct or indirect ownership will not be an issue. Therefore, the dispositive inquiry in making that determination will be whether the stockholder "controls the affairs" of the corporation.

■ Importantly, section 220 is not limited to wholly-owned subsidiaries. A parent corporation may "control" a corporation that it does not wholly own and even one in which the parent has less than a majority stock interest. Even a cursory examination of how "subsidiary" is defined in other contexts shows that the range of "control" may start as low as 20% ownership, *e.g.*, Del.Code Ann. tit. 8, § 203.

### *Weinstein "Controls" Mays Under Section 220(a)(3)*

■ As the foregoing discussion indicates, the term "control" does not have a fixed legal meaning. Its definition varies according to the context in which it is being considered, *e.g.*, fiduciary responsibility, tort liability, filing consolidated tax returns, sale of control.[8] For that reason, "control"—or its absence—is frequently

---

6. Del.Code Ann. tit. 8, § 220(a)(3) (2003).

7. The synopsis attached to the 2003 legislation states:
   [B]ooks and records subject to inspection include those of subsidiaries under certain conditions .... The amendment relating to inspection of books and records of subsidiaries is not intended to affect existing legal doctrine that, as a general matter, respects the separate legal existence of subsidiaries in relation to liability of stockholders to third parties, personal jurisdiction over subsidiaries of Delaware corporations, and discovery in litigation other than under Section 220.

74 Del. Laws 84 S.B. 127 (2003).

8. *See, e.g.,* Christian Kirchner, *Evaluation and Response to Risk: Co–Operation Between Lawyers, Accountants, and Auditors,* 29 J. Corp. L. 385, 394 (2004); Bruce A. McGovern, *Fiduciary Duties, Consolidated Returns, and Fairness,* 81 Neb. L. Rev. 170 (2002); Deborah A. DeMott, *The Mechanisms of Control,* 13 Conn. J. Int'l L. 233, 236–37 (1999); Robert B. Thompson, *Unpacking Limited Liability: Direct and Vicarious Liability of Corporate Participants for Torts of the Enterprise,* 47 Vand. L. Rev. 1 (1994).

used to describe a judicial conclusion that is reached after a fact specific analysis.

As Professor Deborah DeMott has noted, "control assumes very different forms in the paradigmatic relationship between equity investors and a corporation." [9]

Shareholders' control is often latent and indirect in form. Corporate law itself allocates to shareholders only the power to elect directors, and under some circumstances, to remove directors once elected, and to adopt or reject fundamental transactions proposed by directors. Holding a majority of voting power does not in itself place a shareholder in a position of active control. If the shareholder assumes no additional role within the corporation, the shareholder is not a direct participant in operational decisions or in the formulation of strategic policy. Nonetheless, shareholders hold power to control in a latent form because they may be able to remove directors, and in all events may replace the incumbents if they resign or when their terms expire. [10]

■ In the context of imposing fiduciary responsibilities, it is well established in the corporate jurisprudence of Delaware that control exists when a stockholder owns, directly or indirectly, more than half of a corporation's voting power. [11] In addition to the election of directors, many of the most fundamental corporate changes also require approval by a majority vote of the stockholders, e.g., mergers, consolidations, sales of all or substantially all of the assets of a corporation and dissolutions. [12]

■ Conversely, a stockholder that owns less than half of a corporation's shares will generally not be deemed to be a controlling stockholder, with concomitant fiduciary responsibilities. [13] For a stockholder that owns less than a numerical majority of a corporation's voting shares to be deemed a controlling stockholder for purposes of imposing fiduciary obligations, the plaintiff must establish the *actual exercise* of control over the corporation's conduct by that otherwise minority stockholder. [14]

In this case, the Court of Chancery ruled that Mays was a subsidiary of Weinstein for purposes of invoking the 2003 amendment to section 220(a)(3). That ruling was based upon the 45.16% of Mays' stock that Weinstein owned, plus the six or seven percent of stock that the Weinstein Foundation owned. The Court of Chancery also concluded that "[e]ven without the [F]oundation, given the fact that there is no [other] substantial shareholder, I have little trouble concluding that Weinstein Enterprises, Inc. exercises direct or

---

**9.** Deborah A. DeMott, *The Mechanisms of Control*, 13 Conn. J. Int'l L. 233, 236.

**10.** *Id.*

**11.** *See Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del.1994); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del.1989); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del.Ch. 1984).

**12.** *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del.1994).

**13.** *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d at 70; *Gilbert v. El Paso*, 490 A.2d at 1055.

**14.** *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d at 70; *Gilbert v. El Paso*, 490 A.2d at 1055; *Kahn v. Lynch Communication Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del.1994) (considering control of board as evidence of control of business affairs); *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del.1987) ("[u]nder Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.").

indirectly the power to control the affairs of J.W. Mays, Inc."

We hold that the Court of Chancery correctly concluded that whether Weinstein "controlled the affairs" of Mays, for purposes of being a section 220(a)(3) "subsidiary," must be determined by applying the concept of control normally used for the purpose of imposing fiduciary responsibility (the "fiduciary definition"). Applying that definition, because Weinstein had the power to control the affairs of Mays (as distinguished from actually exercising that power), Weinstein "controlled" Mays for purposes of establishing Mays' status as a "subsidiary" of Weinstein.

### Parent Corporation's Production Duty

■ That threshold determination, however, did not conclude the analysis required by the statute. The parent corporation's statutory obligation to produce the subsidiary's documents is qualified. That obligation exists only "to the extent that" the subsidiary documents are in the parent's actual possession and control *or* to the extent that the subsidiary's documents that are in the subsidiary's possession and control can be obtained through the parent's exercise of control over the subsidiary. Thus, section 220(b) provides:

> (b) Any stockholder ... shall, upon written demand under oath stating the purpose thereof, have the right ... to inspect for any proper purpose, and to make copies and extracts from:
>
> 1. ....
>
> 2. A subsidiary's books and records, *to the extent that:*
>
> a. The corporation has actual possession and control of such records of such subsidiary; or

b. The corporation could obtain such records through the exercise of control over such subsidiary .... [15]

The Court of Chancery *did not* determine that Weinstein was able to exercise control over the affairs of Mays for purposes of causing Mays to produce its documents that Weinstein did not already possess. Indeed, the Court of Chancery determined to the contrary. It recognized that "as a practical matter Weinstein may not be able to cause Mays to produce the documents without taking extraordinary steps ... [and that] [a]lthough Weinstein may not be able to, I think the Court [of Chancery] has power to do so by issuing another process."

### Control and Ownership

■ When it stated that, "as a practical matter Weinstein may not be able to cause Mays to produce the documents without taking some extraordinary steps," the Court of Chancery may have been referring to Weinstein's ability to replace some of Mays' board members with persons who might be more willing to produce the subsidiary's documents. To the extent that was what the Court of Chancery had in mind, its approach is inconsistent with a well-established legal proposition: even if a controlling stockholder is able to elect a majority of the subsidiary's board of directors, that ability, without more, does not automatically establish that the parent controls the affairs of the subsidiary corporation for purposes of causing the subsidiary to produce its books and records.

■ For publicly held corporations, the Delaware General Corporation Law contemplates a separation of control and ownership.[16] The board of directors has the

---

**15.** Del.Code Ann. tit. 8, § 220(b) (2003) (emphasis added).

**16.** *Malone v. Brincat,* 722 A.2d 5, 9 (Del. 1998). *See also* Margaret M. Blair, *Owner-*

legal responsibility to manage the business of the corporation for the benefit of its stockholders.[17] This Court has consistently held that the fact the directors of a corporation are elected by the majority stockholder does not relieve those directors of their fiduciary duties to the corporation and its minority stockholders.[18] As Professor DeMott has observed:

The parent, once having elected directors, does not have a right thereafter to interfere. To impose a duty of obedience on directors, moreover, would conflict with the fundamental point that corporate law assigns ultimate managerial power and responsibility to directors. The parent thus lacks the right to assert control through interim instructions, a defining hallmark of a legal relationship of agency. This is not a point of merely formal or definitional significance. As the preceding discussion illustrates, the distinction between a right of control and the effective power to control often has practical consequences. In the absence of a right to control the directors it elects, the parent must either disregard their existence, a move disrespectful of the corporate paraphernalia that jeopardizes the corporate veil insulating the parent from subsidiary-level liabilities, or the parent must take steps to exercise its power by coercing the directors or removing them, moves that have drawbacks of their own.[19]

Mays is a publicly-held New York corporation that is separate from Weinstein. Its directors have an independent duty to protect and further the interests of Mays. The Court of Chancery recognized this when it granted a stay pending appeal, stating that "Mays is a separate legal entity with minority shareholders" and that "the fiduciary duties of the Mays directors do not run directly to Weinstein and Weinstein does not have the unfettered power to tell the Mays board of directors what to do." Although the Court of Chancery correctly acknowledged that independent duty, its interpretation of section 220(b)(2)b did not give that duty appropriate legal deference.

### Section 220(b)(2)b Requires Actual Exercise of Control

■ The Court of Chancery held that Weinstein "controls" Mays. We agree that, as amended in 2003, section 220(a)(3) requires an application of the fiduciary definition of control for purposes of determining "subsidiary" status. But the "fiduciary" definition of control does not carry over into, and govern, the quite different operative provisions of section 220(b)(2)b, which require that the parent be able to exercise its power of control to cause the subsidiary to produce its books and records. For that reason, the Court of Chancery erred in applying the fiduciary definition to determine the meaning of the term "control" in the context of section 220(b)(2)b.

■ The use of the same term "control" in the quite different contexts of both sections 220(a)(3) and 220(b)(2)b renders the amended statute ambiguous. As noted earlier in this opinion, the meaning of the term "control" depends critically upon the *context* in which it is used. Section

---

ship and Control: Rethinking Corporate Governance for the Twenty–First Century (The Brookings Institute, 1995).

**17.** *Malone v. Brincat,* 722 A.2d at 10.

**18.** *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983); *McMullin v. Beran,* 765 A.2d 910 (Del. 2000); *Quickturn Design Sys., Inc. v. Shapiro,* 721 A.2d 1281 (Del.1998).

**19.** Deborah A. DeMott, *The Mechanisms of Control,* 13 Conn. J. Int'l L. 233, 253.

220(b)(2)b requires an actual ability on the part of the parent corporation to exercise control and thereby cause the subsidiary to produce the subsidiary's documents that are not in the parent's possession. Under section 220(b)(2)b, the inquiry in each specific case is not whether the parent has the power to control the affairs of the subsidiary, but whether by exercising actual control, the parent corporation alone can cause the subsidiary to produce its documents.

Although it was decided before the 2003 amendment, *Frank v. Engle* [20] illuminates this distinction. There, the Court of Chancery was required to decide whether a "parent" that was a party before the court was required to produce documents of a less-than-wholly-owned subsidiary that was not a party before the court. There, the plaintiff sought documents of Indiana Financial Investors, Inc., which was 50% owned by a defendant, Hickory Furniture Co.[21] After noting that Indiana was 50% owned by Hickory, the Court of Chancery stated: "[f]or the purposes of this motion, plaintiffs have failed to show that Indiana is controlled by a defendant over whom I have personal jurisdiction." [22] The Court held: "the request [is denied] as it pertains to Indiana because Indiana is not named in this action, and plaintiffs have made no showing that Indiana is a wholly owned subsidiary or alter ego of a named defendant." [23] Thus, even where the parent corporation owned 50% of the shares of the absent subsidiary, that parent corporation did not have "control" for purposes of compelling the absent subsidiary corporation to produce its documents.

To summarize, a parent/subsidiary relationship is established by applying the fiduciary definition of controlling stockholder.[24] But that relationship, once established, only forms the predicate for the Court of Chancery to order the parent corporation to produce the subsidiary's books and records. For even then, the Court of Chancery can do so only to the extent that the parent corporation has "actual possession and control of such records of such subsidiary" [25] or, if the books and records are in the possession of the subsidiary, only where the parent corporation "could obtain such records through the exercise of control over [the] subsidiary." [26] That is, establishing that the subsidiary is a "subsidiary" under the fiduciary test of control, does not provide an *ipso facto* basis to order the parent corporation to produce documents in the subsidiary's possession pursuant to section 220(b)(2)b. It must also be shown that the parent corporation "could obtain such records through the exercise of control over such subsidiary." [27]

### Control Power Not Court Power

Because "control" under the threshold fiduciary definition of "control" did not establish that Weinstein had con-

20. *Frank v. Engle,* C.A. No. 13284, 1998 WL 155553 (Del.Ch. Mar. 30, 1998).

21. *Id* at *6 & n. 10.

22. *Id.*

23. *Id.* at *6.

24. Del.Code Ann. tit. 8, § 220(a)(3).

25. *Id.* § 220(b)(2)a. *Accord Saito v. McKesson HBOC, Inc.,* 806 A.2d 113, 118 (Del.2002)

(holding that a stockholder of the parent corporation would be entitled to inspect the subsidiary's books and records that had *not* been provided to the parent before or after the merger only if the " 'subsidiary is in fact the mere alter ego of the parent ....' ").

26. Del.Code Ann. tit. 8, § 220(b)(2)b.

27. *Id.*

trol of Mays under section 220(b)(2)b, the Court of Chancery was required to grant a remedy that recognized Weinstein's lack of actual control over the affairs of Mays for purposes of causing Mays to produce its documents under section 220(b)(2). Acknowledging that Weinstein could not cause the Mays documents to be produced by resorting to its own control power, the Court of Chancery resorted to its own equitable power: "although Weinstein may not be able to, I think the Court [of Chancery] has the power to do so by issuing another process." That approach, however, cannot be reconciled with the language of the 2003 amendment, which requires a showing that the parent itself is able to cause the production of the subsidiary's documents, by the actual exercise of its control over the subsidiary.

The Court of Chancery stated that it could enforce its order directing the production by Weinstein of the documents possessed and controlled by Mays, in one of two ways: (1) by issuing a commission for the issuance of a subpoena in New York, Mays' home state; or (2) by compelling Weinstein to bring an action for inspection of the books and records of Mays in a New York state court. The first alternative acknowledges that Weinstein alone *cannot* produce the result, and that the court's commission power also is required. This approach is inconsistent with the statutory mandate that *Weinstein* must be shown capable of causing the production of Mays' documents. For the

same reason the second method—compelling Weinstein to bring a books and records action in New York to obtain Mays' documents—is also inconsistent with the statutory language of section 220. Like the "commission approach," it depends upon the exercise of power over Mays by a New York court rather than upon the exercise of control by Weinstein.

The 2003 amendment to section 220 does not provide that, upon a finding that the parent exercises direct or indirect control over the subsidiary's affairs, the Court of Chancery may then order the production of a non-party subsidiary's documents from the subsidiary corporation itself. Rather, the statute provides that, even if there is a finding of direct or indirect exercise of control, the plaintiff stockholder of the parent corporation is not entitled to inspect the subsidiary corporation's documents unless, (a) the parent corporation has "actual possession and control of such records of such subsidiary;" or (b) the parent corporation could obtain such records through the "exercise of control over such subsidiary." [28] The language of the 2003 amendment requires that the control in question be that of the Delaware parent corporation, not the Court of Chancery, *i.e.*, control such that the parent corporation that is before the Court of Chancery can, as a practical matter, deliver for inspection and copying by the stockholder, documents in the possession of a separate subsidiary corporation that is not a party before that court. [29]

---

**28.** Del.Code Ann. tit. 8, § 220(b)(2)a. and b.

**29.** Although they are not implicated in this appeal, we note that two further qualifications are superimposed upon the parent corporation's obligation to produce the subsidiary's documents that are not in the parent's possession. Even if the parent corporation *could* exercise actual control over the production of a subsidiary's documents, its exercise of that control is subject to the two additional

statutory provisos in section 220(b)(2)b.1. and 2.

1. The stockholder inspection of such books and records of the subsidiary would not constitute a breach of an agreement between the corporation or the subsidiary and a person or persons not affiliated with the corporation; and

2. The subsidiary would not have the right under the law applicable to it to deny the

Accordingly, the Court of Chancery's remedy of "issuing another process" is not contemplated by the statutory language of section 220(b)(2)b, which requires the parent corporation to exercise its control, rather than to invoke the equitable power of a court, to compel production of the subsidiary corporation's records. Therefore, insofar as it directs Weinstein to produce for inspection the documents in Mays' possession and control, the judgment of the Court of Chancery must be reversed.

### Mays' Independent Directors

■ Orloff also argues, in the alternative, that the Court of Chancery order requiring the production of Mays' documents is correct and should be affirmed, because the outside directors of Mays who constituted the Special Committee were not independent of Weinstein and, in fact, acted at its behest. This argument finds no support in the record.

Orloff seeks Mays' documents in his capacity as a stockholder of Weinstein, not Mays. Mays is a New York public corporation that does not do business in Delaware. Only two of Mays' seven directors are also directors of Weinstein. Neither of those non-independent Weinstein directors, who are also Orloff's relatives, were members of the Special Committee established by Mays to consider Weinstein's request for the documents that Orloff was seeking to inspect.

Although Orloff does not contend that Mays is a wholly-owned subsidiary or the alter ego of Weinstein, he does submit that the Mays Special Committee board members' findings were only a pretext to accommodate the wishes of Weinstein, its controlling stockholder.

■ The record does not support this claim. To establish that the committee was not independent, it is not enough for Orloff to assert that the Mays directors were nominated by Weinstein, the majority stockholder that controlled the outcome of the board election.[30] A controlling interest or majority stock ownership does not deprive the corporation's directors of the "presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person [or entity]."[31] No such showing was made here.

Under the facts of this case, Mays' separate corporate existence is entitled to respect. Orloff made no showing that any member of the Mays Special Committee lacked independence from Weinstein or that the Special Committee's decision not to produce Mays' confidential documents was in any way wrongful. Accordingly, absent the agreement of Mays' board, Weinstein lacks the power to cause Mays

corporation access to such books and records upon demand by the corporation. Accordingly, even where the parent is able to exercise actual control to produce the documents in the subsidiary's possession, the parent corporation is not required to exercise that control if (1) to do so would breach a contract with a third party, or (2) the subsidiary would have the right to deny the parent corporation access to its document in a proceeding brought directly against the subsidiary under the law of its own domicile.

**30.** *Aronson v. Lewis,* 473 A.2d 805 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

**31.** *Id.* at 815. *See also Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040 (Del.2004); *Grimes v. Donald,* 673 A.2d 1207 (Del.1996); *Rales v. Blasband,* 634 A.2d 927 (Del.1993).

to produce the documents in Mays' possession.

### *Conclusion*

The judgment of the Court of Chancery is reversed. This matter is remanded for further proceedings in accordance with this opinion.