# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PINNACLE IV, L.P., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | C.A. No. N23C-04-021 MAA CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| CYBERLABS AI HOLDINGS LIMITED, PSAFE TECHNOLOGY HOLDING LLC n/k/a AI Technology LLC, and PSAFE TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |

Submitted: May 1, 2024
Decided: July 1, 2024

*Plaintiff's Motion to Dismiss Counterclaims, Strike Affirmative Defenses and for Judgment on the Pleadings:*
**GRANTED.**

## MEMORANDUM OPINION

Andrew D. Cordo, Esquire (Argued), Andrew D. Berni, Esquire, and Joshua A. Manning, Esquire, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, DE, *Attorneys for Plaintiff/Counterclaim Defendant Pinnacle IV, L.P.*

Berton W. Ashman, Jr., Esquire, Jesse L. Noa, Esquire, and Justin T. Hymes, Esquire, of POTTER ANDERSON & CORROON LLP, Wilmington, DE, and Michael J. Baratz, Esquire (Argued) and Patrick F. Linehan, Esquire of STEPTOE LLP, Washington, DC, *Attorneys for Defendants/Counterclaimants*.

**Adams, J.[1]**

---

[1] Sitting as a Vice Chancellor of the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to In re Designation of Actions Filed

## I.    INTRODUCTION

Seller filed a complaint seeking enforcement of a note it received in exchange for the sale of its interests in a company.  Buyer counterclaimed arguing that the note is unenforceable because of seller's fraud in connection with the sale.  To adequately plead fraud, a party must identify an actionable misrepresentation or omission.  Here, the pleadings do not identify a single misrepresentation made by seller.  To salvage this deficiency, buyer resorts to a theory that seller *deputized* management of the company, thereby seeking to impute management's conduct onto seller.

The buyer's agency theory fails.  As a result, buyer's claims for fraud and negligent misrepresentation also fall short.  Therefore, seller's Motion to Dismiss the Counterclaims and to Strike the Affirmative Defenses is granted.  Because buyer lacks any viable affirmative defenses, the Court also grants seller's Motion for Judgment on the Pleadings to Enforce the Note.

---

Pursuant to In re: DESIGNATION OF THE HONORABLE MEGHAN A. ADAMS under Del. Const. art. IV § 13(2) dated September 18, 2023.  According to the Supreme Court's August 18, 2023 Order, the Chief Justice cross designated the undersigned "to sit as a Vice Chancellor on the Court of Chancery for the purpose of hearing and deciding all issues in *Pinnacle IV, L.P. v. CyberLabs AI Holdings Ltd., et al.*, C.A. No. N23C-04-021 MAA (CCLD), once the action is transferred to the Court of Chancery." The action has not yet been "transferred" to the Court of Chancery, but the undersigned interprets the Supreme Court's order that Judge Adams has the authority to hear both legal and equitable claims in this case due to the cross-designation.

## II.     FACTUAL BACKGROUND[2]

### A. PSafe and the use of MIT

PSafe Technology Holding, LLC ("PSafe" or the "Company") developed consumer-oriented cybersecurity products, predominantly serving customers in Brazil.[3]  Marco A. De Mello and Benjamin A. Myers (the "Founders") founded the Company in 2011, and served as CEO and CFO of the Company, respectively.[4]

As part of its growth strategy, PSafe sought to acquire new users who installed its mobile apps.[5]  To do so, PSafe worked with third-party media sources that promoted app installations through advertising with third parties (the "Installation Partners").[6]  The Installation Partners then worked with publishers to place advertisements on the web.[7]

PSafe paid the Installation Partners based on the number of user installations in accordance with certain criteria.[8]  For example, an approved installation required that the user was a real person and not a bot, and that the user was in an approved

---

[2] The facts are drawn from the well-pleaded allegations in the Amended Complaint for Breach of Promissory Note and to Enforce Guaranty ("Amended Complaint" or "AC") (D.I. 15) and Answer and Defenses of Defendants Cyberlabs AI Holdings Limited, PSafe Technology Holding LLC, n/k/a AI Technology LLC, and PSafe Technology, Inc. to Amended Complaint for Breach of Promissory Note and to Enforce Guaranty Counterclaims for Fraudulent Inducement and Negligent Misrepresentation ("Counterclaim" or "CC") (D.I. 19).
[3] CC ¶¶ 45, 46.
[4] *Id.* ¶¶ 3, 45, 175.
[5] *Id.* ¶ 52.
[6] *Id.* ¶ 53.
[7] *Id.*
[8] *Id.*

3

country.[9]  PSafe could then "scrub" reported data for any installations that did not meet the criteria set forth in the Installation Partners' contracts based on reports generated by a third party.[10]  By reducing the number of installations, PSafe lowered the commission the Installation Partners would otherwise be owed for their advertising efforts.[11]

PSafe also developed a proprietary software program called "Marketing Install Tool" ("MIT") that used a "filtering process" initiated on PSafe's back-end servers once a user installed a PSafe product.[12]  The use of MIT was allegedly a less "transparent" way of reducing ineligible installations than the practice of "scrubbing" the data directly from the third-party reports.[13]

## B. Pinnacle Demands Repayment and PSafe Implements Cost-Savings Plan

In 2015, Pinnacle IV, L.P. ("Pinnacle"), a venture capital firm, became a primary creditor to PSafe.[14]  Through 2017, Pinnacle continued to provide financial support through an affiliate of PSafe, PSafe Technology, Inc. ("PSafe, Inc.").[15]  In 2018, Pinnacle demanded repayment of its loans after PSafe failed to meet its

---

[9] *Id.* ¶ 56.  PSafe and Installation Partners relied on AppsFlyer to verify accurate installation counts. *Id.* ¶ 57.
[10] *Id.* ¶ 61.
[11] *Id.* ¶ 54.
[12] *Id.* ¶¶ 64, 66.
[13] *Id.* ¶ 66.
[14] *Id.* ¶ 76.
[15] *Id.* ¶ 77.

4

financial targets.[16]  Following the demand for repayment, PSafe revised its business plan to include additional expense reductions.[17]

To meet these new cost-saving targets, PSafe, through the Founders, allegedly manipulated MIT to underreport eligible installations.[18]  Email correspondence among the Founders and other employees suggest misuse of MIT.[19]  There is no allegation, however, that any Pinnacle-designated manager of PSafe or employee of Pinnacle were on these communications.  Indeed, the Founders and PSafe's User Acquisition team controlled MIT's filters.[20]

## C. Sale to Pinnacle, and Later, to Cyberlabs

After failing to find alternative buyers[21] in the fall of 2020, PSafe, through an affiliate, sold its membership interests to Pinnacle with modifications to the loan agreement between them.[22]  After the sale, and as PSafe's new owner, Pinnacle worked with PSafe's management to sell the Company to a third party.  During this time, the Founders allegedly continued to misuse MIT.[23]

---

[16] *Id.* ¶ 82.
[17] *Id.* ¶ 83.
[18] *Id.* ¶ 84.
[19] *Id.* ¶¶ 98-110, 126-31.
[20] *Id.* ¶ 126.
[21] *Id.* ¶ 95.
[22] *Id.* ¶ 111.
[23] *Id.* ¶¶ 112-117.

At the start of 2021, Pinnacle sold its equity interests in PSafe to Cyberlabs AI Holdings Limited ("Cyberlabs"), an AI company based in Brazil,[24] through a Membership Interest Purchase Agreement (the "MIPA").[25] Pinnacle received cash, common shares of Cyberlabs, and a Secured Promissory Note (the "Cyberlabs Note").[26] PSafe and PSafe Inc. guaranteed the Cyberlabs Note through a Guaranty Agreement (the "PSafe Guaranty").[27]

Cyberlabs made a partial payment towards the end of 2021, after which the parties amended the Cyberlabs Note to adjust the amortization.[28]

About two years after the sale to Cyberlabs, PSafe's Board fired the Founders from their management roles, and within months, new management discovered the alleged misuse of MIT.[29]

On March 1, 2023, Pinnacle sent an email notice to Cyberlabs regarding Cyberlabs' failure to make a payment.[30] To date, Cyberlabs has not paid the requested amounts under the Cyberlabs Note.[31]

---

[24] *Id.* ¶¶ 132, 160.
[25] *Id.* ¶ 8; *id.*, Ex. 1 (the "MIPA").
[26] *See* MIPA; AC, Ex. A ("Cyberlabs Note").
[27] AC, Ex. B (the "PSafe Guaranty").
[28] AC ¶ 20; *id.*, Ex. D.
[29] CC ¶¶ 175-76.
[30] AC ¶¶ 22, 24, 27.
[31] *Id.* ¶ 28.

**D. Procedural History**

On April 4, 2023, Pinnacle initiated this action by filing its original complaint. Pinnacle amended its complaint, raising a claim for breach of the Cyberlabs Note against Cyberlabs, and breach of the Guaranty against PSafe and PSafe, Inc. (collectively with Cyberlabs, "Defendants"). Pinnacle seeks $6 million in relief.

Defendants answered and counterclaimed, alleging that Pinnacle orchestrated a scheme to misrepresent the financials of PSafe. Defendants allege that Pinnacle and the Founders misused MIT and failed to disclose this practice to Cyberlabs.[32]

Pinnacle moved to dismiss the counterclaims, strike the affirmative defenses, and cross-moved for judgment on the pleadings on Pinnacle's claims for enforcement of the Cyberlabs Note and PSafe Guaranty. The Court heard oral argument on February 29, 2024, after which the Court requested supplemental briefing regarding Defendants' affirmative defense of fraudulent inducement with respect to the Founders' fraud, and any effect on the enforceability of the Cyberlabs Note and PSafe Guaranty. The parties fully submitted supplemental responses on May 1, 2024, and the Court took the matter under advisement.[33]

---

[32] CC ¶¶ 22, 140.

[33] The Court requested supplemental briefing after the question was raised whether the alleged fraud of the Founders, who are neither parties to this action nor the Cyberlabs Note nor PSafe Guaranty, can render those contracts unenforceable. *See* Transcript of Oral Argument at 36:14-17 (Counsel for Defendants: "The fraudulent inducement that we are talking about in our affirmative defense is that the founders defrauded us; and so, these contracts are the product of fraud."). For the reasons explained below, the parties' supplemental briefing has not changed the outcome of the Court's analysis, because Defendants' allegations do not tie the Founders' actions to Pinnacle.

## III. ANALYSIS

The Court first addresses Pinnacle's Motion to Dismiss the Counterclaims, followed by the Motion to Strike the Affirmative Defenses, and last, Pinnacle's Motion for Judgment on the Pleadings to Enforce the Cyberlabs Note and PSafe Guaranty.

Defendants' allegations do not show that Pinnacle made misrepresentations of material fact whether directly, or indirectly by any theory of vicarious liability. The Founders are not "agents" of Pinnacle, because in the absence of any right of Pinnacle to control the Founders, the allegations do not raise any inference that Pinnacle actually controlled the Founders. Without allegations of actual control, the Court does not infer an agency relationship between the Founders and Pinnacle.

Defendants also have not alleged facts raising a reasonable inference of *scienter* on the part of Pinnacle as to the alleged fraud of the Founders. The Court therefore denies Defendants' third-party theory of liability that the Cyberlabs Note and PSafe Guaranty are unenforceable on account of the alleged fraud by the Founders. With no other viable affirmative defenses, Defendants cannot avoid the plain meaning of the Cyberlabs Note and PSafe Guaranty. The Court will accordingly enter judgment in favor of Pinnacle with regard to the enforceability of those contracts.

**A. Motion to Dismiss Counterclaims**

On a motion to dismiss for failure to state a claim: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the non-moving party would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.[34] The Court, however, does not credit conclusory allegations unsupported by specific facts.[35]

To plead a viable claim for fraud, a party must state the circumstances constituting fraud with particularity, including time, place, contents and speaker.[36]

Pinnacle moves to dismiss Defendants' counterclaims for fraudulent inducement and negligent misrepresentation. One of the elements required for a claim for fraudulent inducement is a false representation of material fact.[37] "Negligent misrepresentation differs from fraud only in the level of scienter

---

[34] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations and quotation marks omitted).

[35] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[36] Super. Ct. Civ. Rule 9(b); *Universal Capital Mgmt., Inc. v. Micco World, Inc.,* 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012) (internal quotation omitted).

[37] *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *3 (Del. Super. July 31, 2020) (citation omitted); *see also Morris v. Thayer*, 1991 WL 244235, at *2 (Del. Ch. Nov. 15, 1991).

involved, fraud requires knowledge or reckless indifference rather than negligence."[38]

Defendants do not allege that any of Pinnacle's officers, directors or employees made any false representations of material fact. Instead, Defendants argue that the Founders misrepresented material facts regarding the use of MIT.[39] Defendants then characterize the Founders as "Pinnacle's Agents," and thus seek to impute their representations onto Pinnacle.

The burden of proving the existence of an agency relationship falls on the party asserting it.[40] To establish an agency relationship, one party must consent to have another act on its behalf, with the principal controlling and directing the acts of the agent.[41] A party must allege facts supporting a reasonable inference that the purported "principal had control over the wrongdoing at issue."[42] A hallmark of a principal-agent relationship is the principal's right to control the agent's conduct.[43]

---

[38] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013) (citations omitted).

[39] *See* Defendants/Counterclaimants' Answering Brief in Opposition to Plaintiff/Counterclaim Defendant's Motion to Dismiss Counterclaims, Strike Affirmative Defenses, and for Judgment on the Pleadings ("Opp.") at 14-15 (D.I. 27).

[40] *Baccellieri v. HDM Furniture Indus., Inc.,* 2013 WL 1088338, at *3 (Del. Super. Feb. 28, 2013), *aff'd*, 74 A.3d 653 (Del. 2013).

[41] *Id.*; *see also Marshall v. Univ. of Del.,* 1986 WL 11566, at *10 (Del. Super. Ct 1986) (citing Restatement (Second) of Agency § 1 cmt (a) (1958)).

[42] *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *8 (Del. Ch. Aug. 21, 2020).

[43] *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *23 (Del. Ch. Feb. 24, 2020).

Assuming an agency relationship exists, a principal may only be liable for acts committed by an agent acting within the scope of the agency relationship.[44] Although the question of whether an agency relationship exists is normally a question of fact, conclusory and insufficiently pled allegations do not prevent a pleadings-stage dismissal of claims predicated on an agency theory.[45]

Defendants do not identify any communications or agreement, written or otherwise, showing that Pinnacle consented to have the Founders or any other of PSafe's managers or employees act on Pinnacle's behalf.[46] The Court thus analyzes whether Pinnacle "controll[ed] and direct[ed]" PSafe's acts such that it can infer an agency relationship.[47] Importantly, the Court's focus is on Pinnacle's control over the Founders' alleged manipulation of MIT.[48]

Defendants argue that the following factors raise an inference of an agency relationship: Pinnacle's (a) ownership of PSafe; (b) pressure on PSafe to push through a sale and improve its financials; (c) "hands-on" involvement in the

---

[44] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *3 (Del. Ch. Nov. 13, 2018); *Hospitalists of Delaware, LLC v. Lutz*, 2012 WL 3679219, at *17 (Del. Ch. Aug. 28, 2012).
[45] *See, e.g.*, *Skye Mineral Invs., LLC*, 2020 WL 881544, at *23−24 (citation omitted); *Baccellieri*, 2013 WL 1088338, at *3; *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005).
[46] *Baccellieri*, 2013 WL 1088338, at *3.
[47] *Id*. (citing Restatement (Second) of Agency § 1 Cmt (a)).
[48] *Otto Candies, LLC*, 2020 WL 4917596, at *8.

business; and (d) "deputiz[ation]" of the Founders, who would receive 10% of the proceeds from a sale.[49]

Defendants fail to raise a reasonable inference of the existence of an agency relationship. An agency relationship does not sprout from the ground of total ownership or alignment of economic interests alone. Neither Pinnacle's ownership of PSafe[50] nor the potential for the Founders to receive a tenth of the proceeds of a sale converts the Founders into Pinnacle's agents.[51]

---

[49] CC ¶ 30. During oral argument, the Court inquired as to the meaning of the phrase "deputizing" the Founders. Transcript of Oral Argument at 13:17-20; 28:3-6. While Defendants' counsel did not directly address the Court's question, the Court infers that "deputizing" means that Pinnacle appointed the Founders to push through a sale of PSafe.

[50] *See Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 509 (Del. 2005) (citations omitted) (finding no inference of an agency relationship based on a parent's complete ownership of a subsidiary); *Skye Mineral Invs., LLC*, 2020 WL 881544, at *24.

[51] *Otto Candies, LLC*, 2020 WL 4917596, at *13 (finding no agency relationship where founding member of a company derived nearly one-third of its revenues from the company and nearly half of the company's personnel worked at the founding member). Defendants argue that because Pinnacle "controlled" the sale process, the Court can infer that the Founders were acting as Pinnacle's agents. But Defendants' arguments ignore PSafe's separate corporate existence from Pinnacle, as well as the absence of Pinnacle's right to control the actions of the Founders who were fiduciaries to PSafe, not Pinnacle. There are no well-pled allegations in the Counterclaim that in the absence of Pinnacle's right to control the Founders, Pinnacle exercised actual control of the Founders. The only allegations are that Pinnacle instructed the Founders to go through with the sale process, and incentivized them with 10 percent of the proceeds. CC ¶¶ 8, 28, 30, 105. These allegations fall short of establishing the control necessary to infer an agency relationship, because the allegations do not raise any inference of coercion, or disregard of the corporate form. *See Weinstein Enterprises, Inc.*, 870 A.2d at 509 ("The parent, once having elected directors, does not have a right thereafter to intervene. To impose a duty of obedience on directors, moreover, would conflict with the fundamental point that corporate law assigns ultimate managerial power and responsibility to directors. The parent thus lacks the right to assert control through interim instructions, a defining hallmark of a legal relationship of agency. This is not a point of merely formal or definitional significance. As the preceding discussion illustrates, the distinction between a *right* of control and the *effective power* to control often has practical consequences. In the absence of a right to control the directors it elects, the parent must either disregard their existence, a move disrespectful of the corporate paraphernalia that jeopardizes the corporate veil, ... or the parent must take steps to exercise its power by coercing the directors or removing them, moves that have

Defendants' allegations of Pinnacle's "hands-on" involvement, pressure to push through a sale, and references urging the need to achieve profitability do not change the outcome. These generalized allegations make no specific reference to the alleged misuse of MIT. Likewise, Defendants circularly argue that an agency relationship exists because of the "deputiz[ation]" of the Founders. Defendants must allege specific control over the alleged misconduct—here, misuse of MIT. They do not do so.[52]

Defendants similarly miss the mark by relying on the Founders' representations to the PSafe Board that management was going to "better" employ MIT to reduce fraud.[53] Showing Pinnacle's mere awareness of MIT or identifying the Founders' representations of improved use of MIT does not raise a reasonable inference that Pinnacle was even aware of MIT's misuse; representations of MIT's

---

drawbacks of their own."); *Skye Mineral Invs., LLC*, 2020 WL 881544, at \*24 ("Plaintiffs ask me to 'infer' a principal-agent relationship based on the [certain] Defendants' ability to 'direct and control [three companies] in connection with the conduct at issue.' But 'effective power to control' is not enough to establish a principal-agent relationship. Indeed, 'even when the parent owns all the stock in the subsidiary, the subsidiary's directors are not agents of the parent.'").

[52] In fact, Cyberlabs has appeared to plead that only the Founders had control of MIT. *See* CC ¶ 126 ("PSafe employees were aware that MIT's filters could be altered or used to block installations from a specific partner, but knew that this process was managed exclusively by the UA team—specifically, Mr. Patel and Mr. Graham, who reported directly to Mr. De Mello.").

[53] *See id.* ¶¶ 88, 108. PSafe also generally relies on Pinnacle's status as a creditor and the terms of its loan agreement, but it makes no specific references to Pinnacle's alleged leveraging of those terms with respect to the misuse of the MIT. *Id*. at ¶¶ 77, 82.

improved use suggest, rather, the opposite – *i.e.*, efforts to prevent Pinnacle from learning of the alleged misuse of MIT.[54]

Because Defendants failed to allege any facts raising a reasonable inference that an agency relationship existed, Defendants cannot impute communications by the Founders or employees onto Pinnacle. Defendants have not alleged that Pinnacle itself made any allegedly false representation; therefore Defendants' claims for fraud and negligent misrepresentation against Pinnacle fail and will be dismissed.[55]

**B. Motion to Strike Affirmative Defenses**

Pinnacle moves to strike Defendants' five affirmative defenses to the amended complaint: fraudulent inducement, negligent misrepresentation, unclean hands, improper venue, and failure to state a claim.

Though motions to strike are not favored and are granted sparingly,[56] under Rule 12(f), "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[57] When addressing a motion to strike an affirmative defense, the Court assumes the truth of

---

[54] Defendants' reliance on the "technical knowledge" of Pinnacle's point of contact on PSafe's management team also falls short. Having a background in electrical engineering, along with making edits to PSafe's "Code and Policy Analysis" document as it relates to PSafe's compliance with Google Play policies do not show knowledge, much less control, of the alleged misuse of MIT. *See id.* ¶ 123.

[55] *Dunn v. FastMed Urgent Care, P.C.,* 2019 WL 4131010, at *12 (Del. Ch. Aug. 30, 2019) (dismissing negligent misrepresentation claims based on failure to plead fraud claims with requisite particularity).

[56] *Columbus Life Ins. v. Wilm. Tr.,* 2021 WL 537117, at *5 (Del. Super. Feb. 15, 2021).

[57] Super. Ct. Civ. R. 12(f).

the facts alleged in the answer and asks whether "the challenged defense is legally sufficient."[58] Nonetheless, "affirmative defenses must be supported by pled facts."[59]

Defendants argue that, even in the absence of a viable fraud claim against Pinnacle, they have sufficiently alleged (though not asserted) a fraud claim against the Founders. On that basis, they argue they are justified in seeking their prayer for rescission of the Cyberlabs Note and PSafe Guaranty.[60]

In seeking to make Pinnacle secondarily liable for the Founders' alleged fraud, Defendants rely primarily on *Falco v. Alpha Affiliates, Inc.*.[61] In *Falco*, the District of Delaware relied on the Restatement (Third) of Suretyship and Guaranty (the "Restatement") in ruling on a party's motion in limine.[62] Section 12 of the Restatement provides that "a secondary obligation is voidable due to a fraudulent or material misrepresentation by the obligee that induces the secondary obligor to enter into the secondary obligation."[63] The court then discussed that a guarantor to a tenant could potentially avoid its obligations to a landlord for the tenant's delinquent payments upon a finding that the obligee, the landlord, induced the guarantor to enter into the guaranty agreement.[64]

---

[58] *Pilot Corp. v. Abel,* 2023 WL 8643195, at *2 (Del. Ch. Dec. 13, 2023).
[59] *Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2021 WL 2182828, at *5 (Del. Ch. May 28, 2021) (citations omitted).
[60] *See* CC, Request for Relief; Opp. at 36.
[61] *See Falco v. Alpha Affiliates, Inc.*, 2000 WL 727116, at *1 (D. Del. Feb. 9, 2000).
[62] *Id*.; Restatement (Third) of Suretyship & Guaranty § 12 (1996).
[63] Restatement (Third) of Suretyship & Guaranty § 12.
[64] *Falco,* 2000 WL 727116, at *4-5.

A contract is not voidable due to the misrepresentation by one other than an obligee, if the obligee has in good faith and without notice given value or changed position in reliance on the contract.[65] This rule is consistent with the general principle of law that if an innocent person has in good faith and without notice given value or changed position in reliance on the contract, the contract is not voidable on the ground of misrepresentation.[66]

PSafe cannot seek to avoid its guaranty obligations on the basis that Pinnacle as the *obligee* made a fraudulent representation, because PSafe has not alleged any fraudulent representation by Pinnacle. To the extent Defendants seek to avoid their obligations based on alleged misrepresentations by one other than an obligee, *i.e.*, the Founders, Defendants have not shown that Pinnacle failed to act in good faith and without notice given value or changed position in reliance on these contracts. As explained above, Defendants have not made allegations raising a reasonable inference that Pinnacle was aware of the misuse of MIT.[67] Pinnacle also received

---

[65] Restatement (Third) of Suretyship & Guaranty § 12(2) cmt. (e).
[66] *See* Restatement (Second) of Contracts, § 164(2) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction."); *see also* 26 Williston on Contracts § 69:14 (4th ed.) ("Another exception to the general rule of nonliability applies where, although the misrepresentations were not made by one acting as agent of the party benefited, that party: was or should have been cognizant of them, or was the cause of their being made[, or] gave no value for what he or she received, or gave no value until after learning of the misrepresentations[.]").
[67] *See, e.g., supra* note 53.

as consideration the right to enforce the Cyberlabs Note and PSafe Guaranty in exchange for selling PSafe's shares through the MIPA.

Defendants' affirmative defense of fraudulent inducement is therefore stricken. Similarly, because Defendants have failed to allege an actionable misrepresentation by Pinnacle, its affirmative defense of negligent representation is also stricken.

Defendants' allegations fail to give any support to the remaining three affirmative defenses. Defendants predicate their affirmative defenses of unclean hands and failure to state a claim on Pinnacle's alleged fraud. As explained above, Defendants have failed to state a claim for fraud. Therefore, the affirmative defense of unclean hands, predicated on Pinnacle's alleged fraud, also fails. As to improper venue, Cyberlabs cite to the MIPA's New York forum selection clause. Yet, Pinnacle's claims arise in part from the PSafe Guaranty, which provides that Delaware is the parties' choice of forum.[68] For these reasons, the remaining affirmative defenses fail.

---

[68] *See* PSafe Guaranty § 9(h). Defendants concede that this action properly belongs in this forum by failing to address in their answering brief Pinnacle's argument that Defendants waived their right to assert claims under MIPA's New York forum selection clause by their conduct in filing counterclaims in this Court. *Larkin v. Shah*, 2016 WL 4485447, at *2 n.5 (Del. Ch. Aug. 25, 2016) (finding waiver due to party's omission in answering brief); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *Jackson v. Coupe,* 2017 WL 3396494, 2 (Del. Super. July 14, 2017).

## C. Motion for Judgment on the Pleadings

Pinnacle moves for judgment on the pleadings to enforce its claims under the Cyberlabs Note and PSafe Guaranty. A party may move for judgment on the pleadings pursuant to Civil Rule 12(c).[69] A court may grant a motion for judgment on the pleadings "where there is no material fact in dispute and the movant is entitled to judgment as a matter of law."[70] The Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[71]

Cyberlabs agreed to pay Pinnacle "the lesser of Nine Million Dollars ($9,000,000) or the principal balance outstanding," and interest, with an original maturity date of February 1, 2024.[72] Under the Cyberlabs Note's amended amortization schedule, $517,088.28 in principal and interest became due on March 1, 2023.[73] Failure to make a payment when due constitutes an "Event of Default after five days of such non-payment."[74] Upon the occurrence of an Event of Default, Pinnacle may, by written notice to Cyberlabs, "declare all outstanding amounts and

---

[69] Super. Ct. Civ. R. 12(c).
[70] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 1992 WL 181718, at *1 (Del. Ch. July 28, 1992), *rev'd*, 624 A.2d 1199 (Del. 1993).
[71] *Warner Communications, Inc. v. Chris-Craft Indus., Inc.,* 583 A.2d 962, 965 (Del. Ch. 1989).
[72] Cyberlabs Note at 1.
[73] *Id.*; AC ¶ 20.
[74] Cyberlabs Note at 2.

obligations payable by [Cyberlabs] hereunder to be immediately due and payable."[75]

Pursuant to the PSafe Guaranty, PSafe and PSafe, Inc. "unconditionally guarantee[d] and promise[d] to pay and perform as and when due, whether at stated maturity, upon acceleration or otherwise, any and all of the Guaranteed Obligations."[76]

Defendants admit CyberLabs did not make any payments on March 1, 2023, when payment became due under the Cyberlabs Note, nor did Cyberlabs cure that failure within five business days.[77]  Defendants also admit Cyberlabs received the written notice of Pinnacle's right to declare all outstanding amounts immediately due and payable.[78]  Defendants' only defense is that the Cyberlabs Note and PSafe Guaranty were void *ab initio* due to fraud.

Defendants have made no well-plead allegations of fraud.  Accordingly, because there are no material issues of fact or viable defenses, Pinnacle is entitled to judgment in its favor as a matter of law.

---

[75] *Id*. at 3.

[76] PSafe Guaranty § 2(a).

[77] *See* Answer ¶ 22 ("Defendants admit that CyberLabs did not make a payment to Pinnacle on March 1, 2023, but deny that any payments were due on the Note on March 1, 2023. Defendants informed Plaintiff that the Note and the Guaranty are void ab initio due to fraud. Therefore, no payment was or is owed to Plaintiff. To the extent any further response is required, Defendants deny the allegations contained in Paragraph 22."); *see also id*. ¶¶ 23, 26.

[78] *Id*. ¶ 27.

## IV.  CONCLUSION

For the reasons set forth above, Pinnacle's Motion to Dismiss Counterclaims, Strike Affirmative Defenses, and for Judgment on the Pleadings is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**