# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| IN RE LULULEMON ATHLETICA INC. | ) | CONSOLIDATED |
| 220 LITIGATION | ) | C.A. No. 9039-VCP |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 1, 2014
Date Decided:  April 30, 2015

Carmella Keener, Esq., Jessica Zelden, Esq., P. Bradford deLeeuw, Esq., ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Blake A. Bennett, Esq., COOCH & TAYLOR, P.A., Wilmington, Delaware; Joshua Littlejohn, Esq., Max Gruetzmacher, Esq., Mt. Pleasant, South Carolina; Gustavo Bruckner, Esq., Ofer Ganot, Esq., POMERANTZ LLP, New York, New York; *Attorneys for Plaintiff Laborers' District Council Construction Industry Pension Fund and Plaintiff Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund.*

John L. Reed, Esq., Scott B. Czerwonka, Esq., DLA PIPER LLP (US), Wilmington, Delaware; Stellman Keehnel, Esq., Andrew Escobar, Esq., DLA PIPER LLP (US), Seattle, Washington; *Attorneys for Defendant lululemon athletica inc.*

**PARSONS, Vice Chancellor.**

In this books and records action under 8 *Del C.* § 220, I previously ordered the defendant corporation to produce books and records relating to the plaintiffs' investigation of potential insider trading or *Brophy* claims against the company's founder and then-chairman of the board of directors, as well as potential claims for mismanagement against the other directors. The company produced documents pursuant to that order, but the plaintiffs found the production inadequate and moved to enforce the Court's order. Their motion presents several questions for resolution: (1) whether the company must search its non-employee directors' personal email accounts for documents responsive to my previous order; (2) whether certain documents properly were designated as privileged; and (3) even if those documents are privileged, whether the plaintiffs have shown "good cause" under the circumstances to obtain them anyway.

For the reasons stated in this Memorandum Opinion, I deny in part and grant in part the plaintiffs' motion to enforce. Specifically, I conclude that ordering the company to search its non-employee directors' personal email accounts is not warranted, but I find that the plaintiffs have demonstrated "good cause" to access certain documents withheld as privileged.

## I.     BACKGROUND

### A.     Parties

Defendant, lululemon athletica, inc. (the "Company" or "lululemon"), is a Delaware corporation with its principal place of business in Vancouver, British Columbia, Canada. Lululemon is a designer and retailer of athletic apparel and operates throughout North American and Australia. Its stock is traded on the NASDAQ.

1

Plaintiffs, Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund ("Hallandale") and Laborers' District Council Construction Industry Pension Fund ("LDC"), are both lululemon stockholders.

## B.     Facts

On December 12, 2012, Dennis Wilson, lululemon's founder and then-Chairman of the Board of Directors, entered into a trading plan pursuant to Securities and Exchange Commission ("SEC") Rule 10b5-1 to sell up to 5.7 million of his shares of lululemon common stock over a period of up to eighteen months (the "Trading Plan"). Wilson's broker at Merrill Lynch had complete discretion to sell the shares during that period consistent with the terms of the Trading Plan. Specifically, Merrill Lynch could sell 300,000 shares at market price beginning January 10, 2013. From that point through June 30, 2014, the broker could sell up to 1 million shares per month at a minimum price of $81.25 per share.[1] Between January 10 and January 14, 2013, the broker sold 300,000 shares at an average price of $70.92. In May and June, 2013, Wilson's broker sold one million shares each month, all at prices above $81.25. Whenever Merrill Lynch sold shares under the Trading Plan, it sent an email notification to lululemon Controller David

---

[1]     Pls.' Opening Br. Ex. A [hereinafter, the "Company Production"], at lulu000118–19.

Negus and Tina Swinton, among others.[2]  Swinton was the CFO of Wilson's "Family Office," which operated as his personal investment company.

Of particular importance are the trades that occurred on June 4 and 7, 2013.  On June 5, Christine Day, lululemon's then-CEO, informed Wilson that she planned to resign.  She informed the Board to that effect on Friday, June 7.  On that same day, Wilson's broker sold 607,545 shares of Wilson's lululemon stock, over 200,000 shares more than he had sold on any other day during the first six months of the Trading Plan.  By selling such a quantity, Wilson reached his one-million-share-per-month cap only seven days into June.  On June 10, 2013, the Company publicly announced Day's resignation, and the per-share price for lululemon stock dropped roughly 22%.  After June 7, 2013, Wilson's broker did not make any additional sales under the Trading Plan, and it expired at the end of June 2014.

On June 12, 2013, the *Wall Street Journal* (the "WSJ") emailed the Company about Wilson's June 2013 trades, which appeared incredibly well-timed.  The WSJ sought confirmation of certain facts for a story regarding Wilson's trades.[3]  As relevant to the pending motion, individuals from lululemon and Wilson's Family Office, including both Wilson's personal attorney and lululemon's attorney, corresponded by email about a

---

[2]  *See* Company Production at lulu000046–47 (authorizing Merrill Lynch to notify Swinton and Negus under the Trading Plan); *see also* Company Production at lulu000156 (example of the email notification).

[3]  Suzanne Kapner, *Timing of Stock Sales Favors Lululemon Insider*, WALL ST. J., (Jun. 12, 2013), http://www.wsj.com/articles/SB10001424127887324049504578541821613302146.

coordinated response to the WSJ's inquiry (the "WSJ Email Chain"). The participants in the WSJ Email Chain included, among others, Wilson and Swinton.[4] Some of the emails in that chain were authored either by Wilson's personal attorney or by lululemon's outside counsel. Wilson's Family Office ultimately released a statement regarding the trades,[5] but the Company did not comment on it. In addition, on July 2, 2013, Erin Nicholas, lululemon's corporate secretary and one of its in-house counsel, responded to an email from lululemon director Jerry Stritzke about whether Wilson's trades had complied with the Trading Plan (the "Nicholas Email").

## C. Procedural History

On May 3, 2013, Hallandale commenced its 8 *Del. C.* § 220 ("Section 220") action against lululemon. On October 25, 2013, LDC filed a separate Section 220 action. I heard argument on the Company's motion to dismiss the Hallandale action on February 5, 2014, and held a trial in the LDC action on February 19, 2014. On April 2, 2014, I issued an oral ruling regarding both actions (the "April 2014 Order").[6] I concluded that Plaintiffs had a proper purpose under Section 220 to seek books and records regarding Wilson's June 7, 2013 trades because there was a credible basis to infer wrongdoing by Wilson and lululemon. Specifically, in addition to a possible *Brophy* claim against

---

[4]     Pls.' Opening Br. Ex. B [hereinafter, the "Privilege Log"].

[5]     Company Production at lulu000037.

[6]     *See In re lululemon athletica inc. 220 Litig.*, Consol. C.A. No. 9039-VCP (Del. Ch. April 2, 2014) (TRANSCRIPT) [hereinafter, the "April 2014 Order"].

4

Wilson,[7] I concluded that Plaintiffs had demonstrated a credible basis to infer possible mismanagement by the Company in connection with their oversight as to the questionable trading.[8]

Based on those findings, I ordered the Company to produce, among other documents: (1) the Trading Plan; (2) any emails from Wilson to lululemon's compliance office regarding the Trading Plan; (3) any changes to the Trading Plan; (4) all documents concerning Wilson's June trades; and (5) all documents concerning any inquiry by the board or any member of the board regarding Wilson's trades between June 1 and June 30, 2013.[9] On April 18, 2014, lululemon produced 195 pages of documents. The next day, it produced a privilege log referencing sixteen documents it had withheld under the

---

[7] *Kahn v. Kolberg Kravis Roberts & Co.*, 23 A.3d 831, 838 (Del. 2011) (For a *Brophy* claim, "The plaintiff must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information") (footnotes and internal quotation marks omitted); *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[8] April 2014 Order 30; *see also id.* at 29-30 ("Based on the nature of the June 7th trade and the absence of any evidence of public statements or other indications that the Company's board examined the trade or Wilson's conduct, Plaintiffs have established a credible basis for inferring that the Company's board may have mismanaged this situation, in terms of its monitoring.").

[9] April 2014 Order 38–42. In the April 2014 Order, I ordered the Company to produce any documents related to any inquiry by the directors or the board regarding Wilson's trading plan from July 1, 2012 to April 2014. At argument on the pending motion to enforce, however, I limited any subsequent search by the Company to any inquiry that occurred between June 1 and June 30, 2013. Arg. Tr. 61.

5

attorney-client privilege. The Nicholas Email and the WSJ Email Chain comprise five of the documents identified on that log.

On June 11, 2014, I consolidated the Hallandale and LDC actions to facilitate enforcement of the April 2014 Order, and two days later, Plaintiffs filed this motion to enforce the April 2014 Order. On July 23, before briefing in connection with this motion had concluded, the Delaware Supreme Court decided *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*.[10] In *Wal-Mart II*, the Supreme Court held for the first time that the so-called fiduciary exception to attorney-client privilege based on the *Garner v. Wolfinbarger*[11] decision applied to Section 220 actions.[12] Because Plaintiffs relied extensively on *Wal-Mart II* in their August 26, 2014 reply brief, I accepted as a sur-reply Defendant's November 24, 2014 letter addressing the implications of the *Wal-Mart II* decision. This Memorandum Opinion represents my ruling on Plaintiffs' motion to enforce.

### D.    Parties' Contentions

Plaintiffs assert that the dearth of certain documents in lululemon's production indicates that the Company has not complied with the April 2014 Order. In particular, Plaintiffs seek: (1) "all communications authored or received by any Board member (including e-mails located in non-Company e-mail accounts) in June 2013 concerning

---

[10]    95 A.3d 1264 (Del. 2014) [hereinafter "*Walmart II*"].

[11]    430 F.2d 1093 (5th Cir. 1970).

[12]    *Wal-Mart II*, 95 A.3d at 1278. I note that prior Court of Chancery cases had found that exception applicable in the context of Section 220. *See infra* note 65.

Wilson's June 2013 stock sales"; (2) "all communications authored or received by any Board member (including e-mails located in non-Company e-mail accounts) concerning any inquiry or investigation into Wilson's June 2013 trade"; and (3) information "concerning the 'disagreement' between Wilson and Day that culminated into [sic] Day's resignation on June 5, 2013."[13] At argument, Plaintiffs waived their request as to item (3), but they persisted in seeking to compel production of additional documents under items (1) and (2), if any exist.[14]

In that regard, Plaintiffs argue that lululemon must search the personal email accounts of the Board members who are not Company employees (the "Non-Employee Directors"),[15] and produce any documents contained therein that fall within the relevant categories of the April 2014 Order. Plaintiffs contend that it is immaterial that the email accounts are not Company accounts, because the directors use them to conduct lululemon business. Lululemon counters that there is no precedent to support requiring such a search in the context of a Section 220 action, and that, under the circumstances of this

---

[13]   Pls.' Opening Br. 8.

[14]   Arg. Tr. 5.

[15]   From the record currently before this Court, it is not apparent how many of lululemon's directors are non-employees, or, for that matter, how many directors lululemon has on its board. For purposes of this Memorandum Opinion, neither of those facts makes a difference. As discussed in more detail *infra*, the distinction between employee directors and non-employee directors is significant only because of the issue of what emails would have been included in the Company's production, by virtue of the location of the email account, *i.e.*, on the Company's server, or not.

7

case, any documents that might come up in a search of the directors' personal emails are not necessary and essential to the purpose of Plaintiffs' demand, making a costly and time-consuming search unwarranted.

Additionally, Plaintiffs seek production of the Nicolas Email and the WSJ Email Chain, contending that they were improperly designated as privileged. Plaintiffs dispute the privilege claim as to the Nicholas Email because they maintain that Nicholas was not acting as an attorney when she responded to an inquiry about the trading plan. They similarly contend that the WSJ Email Chain is not privileged because any privilege was waived by the inclusion of third-parties Wilson and Swinton on the emails. In the alternative, Plaintiffs assert that, under *Garner* and *Wal-Mart II*, the five withheld documents are not privileged as to them.

As to the privilege issues, lululemon responds that the Nicholas Email was properly withheld because Nicholas, as one of lululemon's in-house counsel, was giving legal advice. With respect to the WSJ Email Chain, lululemon argues that it did not waive privilege through disclosure because it shared a common interest with Wilson and Wilson's representatives in connection with responding to the WSJ inquiry. Finally, lululemon contends that Plaintiffs waived any argument regarding the *Garner* exception because they failed to raise the argument in their opening brief. Furthermore, even if *Garner* does apply, lululemon asserts that Plaintiffs have not satisfied their burden of showing "good cause" as required under that line of cases.

8

## II.    THE NON-EMPLOYEE DIRECTORS' EMAILS

As relevant here, in the April 2014 Order, I ruled that Plaintiffs' request for "All documents concerning any investigation or inquiry by any member of Lululemon's board of directors . . . or any Company employee, or any representative on behalf of any Board member of the Company, concerning Mr. Wilson's trades in Lululemon stock during the Relevant Time Period" was necessary and essential to Plaintiffs' proper purpose of investigating whether the Board adequately monitored insider trading activity.[16]    I also held that Plaintiffs' request for "All documents concerning Mr. Wilson's trades in Lululemon stock during the Relevant Time Period" was necessary and essential, but limited the scope of the Company's required production to documents from the month of June 2013.[17]

As to the first category of documents, Plaintiffs complain about the "dearth" of documents produced by the Company, asserting that they "expected to see *some* e-mail correspondence . . . to or from Wilson and/or e-mails among Board members" regarding Wilson's trades, but none appeared in the Company's 195 page production.[18]    Similarly, Plaintiffs express dismay that the Company produced "only a *single* document related to any investigation or inquiry conducted by the Company, its Board, or anyone else

---

[16]    April 2014 Order 41-42.

[17]    *Id*. at 40-41.

[18]    Pls.' Opening Br. 9-10.

regarding Wilson's trades."[19] Plaintiffs infer that there must be "gaps" in the Company's production, and ask the Court to order "Lululemon to search for the following: all communications authored or received by any Board member (including e-mails located in non-Company e-mail accounts) concerning any inquiry or investigation into Wilson's June 2013 trades."[20]

Lululemon's Non-Employee Directors apparently do not have company email accounts and instead conduct any Company-related business through email accounts of their own.[21] The Company searched its servers for responsive documents in connection with their production under the April 2014 Order, but it did not inquire about, or otherwise search, the directors' personal email accounts.[22] Thus, the main documents

---

[19] *Id*. at 12. That lone document apparently is an email sent to lululemon's regional managers the same day that the article questioning Wilson's trades appeared in the WSJ. In it, Jessica Price, an employee in "ops solutions," instructed the email recipients not to respond to media requests in that regard, but to forward them to a specified email address. Price also briefly explained the Company's position, stating that, "In short, Chip's stock sales under his 10b5-1 plan are in alignment with the SEC guidelines for these types of stock sales." Company Production at lulu000141.

[20] Pls.'s Opening Br. 13.

[21] Def.'s Answering Br. 21; Arg. Tr. 43–44.

[22] Presumably, when producing emails in response to discovery requests or a Section 220 demand, a company first images its computer servers, if necessary, and then searches that copy for responsive emails. *See, e.g.*, *Cenveo Corp. v. Slater*, 2007 WL 442387, at *2–3 (E.D. Pa. Jan. 31, 2007) (ordering the plaintiff to select a computer forensic expert to image the defendants' computers without substantially interrupting the defendants' business or removing the computers from the premises); *see also In re Info. Mgmt. Servs., Inc. Deriv. Litig.*, 81 A.3d 278, 286–87 (Del. Ch. 2013). The servers, however, capture only those emails sent through

10

Plaintiffs seek in this regard are email communications between or among the Non-Employee Directors, if any exist, because those would not have been captured by the Company's earlier production effort.

## A. Legal Standard

In the context of a Section 220 action, stockholders with a proper purpose "should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy that proper purpose."[23] The rationale for allowing inspection of corporate books and records is to provide the stockholder with "enough information to effectively address the problem" through derivative litigation or other means.[24] Nevertheless, even if a stockholder's purpose is proper, Section 220 "does not open the door to the wide ranging discovery that would be available in support of litigation,"[25] because "the stockholder's inspection right is a 'qualified' one."[26] Determining the appropriate scope of inspection under Section 220 is "fact specific and

---

them—that is, emails sent over the company's network using company email accounts. Correspondence between the Non-Employee Directors that were not also sent or copied to an employee director or officer, if any existed, would not appear on that network, and thus would not be retrieved by any search of the Company's servers.

[23] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).

[24] *Id.*

[25] *Id.* at 114.

[26] *United Techs. Corp. v. Treppel*, 109 A.3d 553, 559 (Del. 2014).

will necessarily depend on the context."[27] This Court "must circumscribe orders granting inspection 'with *rifled precision*,'"[28] and the relevant inquiry in confining the scope of such an order is "[w]hether or not a particular document is *essential* to a given inspection purpose."[29]

**B.      The Scope of the April 2014 Order**

For the reasons that I will discuss shortly, I conclude that in the circumstances of this case, an order requiring the Company to search the independent directors' non-Company or personal email accounts is unwarranted, because any such emails are not "necessary and essential," and Plaintiffs' request goes beyond the scope of the April 2014 Order. As a threshold matter, however, I note that even if Plaintiffs could establish that those documents were necessary for their proper purposes, it is not clear that the Court could require that Plaintiffs receive access to those documents under Section 220. The statute recognizes a stockholder's right to inspect "[t]he corporation's stock ledger, a list of its stockholders, and its other books and records."[30] That right extends, for example, to the books and records of a corporation's subsidiary, but only to the extent the corporation has "actual custody and control of such records," or "could obtain such

---

[27]     *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 372 (Del. 2011) [hereinafter "*Espinoza II*"]; *see also United Techs. Corp.*, 109 A.3d at 558.

[28]     *Espinoza II*, 32 A.3d at 372 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 570 (Del. 1997)).

[29]     *Id.* at 372 (emphasis added).

[30]     8 *Del. C.* § 220(b)(1).

records through the exercise of control over" the subsidiary.[31] The statute is silent as to the books and records of the corporation's directors, and Delaware courts have not read Section 220 so broadly as to include, as a general matter, books and records in a director's personal possession.[32] If anything, the prevailing rule appears to cut against the inclusion of such documents.[33] Plaintiffs therefore overstate the extent to which *Wal-Mart*[34] and *Wal-Mart II* aid their cause on this point.[35] If, following those cases, I were to

---

[31]    8 *Del. C.* § 220(b)(2); *see also Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 508-11 (Del. 2005).

[32]    *See Clark Enters., Inc. v. Hollywell Corp.*, 1982 WL 17855, at *2 (Del. Ch. Apr. 13, 1982) (granting plaintiff stockholder inspection of Hollywell's books and records under Section 220, but noting that "[t]he personal records and documents of [Hollywell's director and 80% stockholder], copies of which are not found among Hollywell's records and files, are not subject to inspection as a part of this proceeding. If discovery is sought of [those] personal records, it must be obtained through other means."); *see also Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *10 (Del. Ch. Oct. 19, 2001).

[33]    *See* 1 EDWARD P. WELCH, ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 220.04[D], at 7-221 (6th ed. 2015).

[34]    *Ind. Electr. Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, 7779-CS, at 97-98 (Del. Ch. May 20, 2013) (TRANSCRIPT) [hereinafter "*Wal-Mart I*"].

[35]    In *Wal-Mart I*, this Court ordered that certain officers and directors who were designated as custodians in the Section 220 discovery had to search their personal devices and computers for responsive documents. *Id.*; *see also Ind. Electr. Workers Pension Trust Fund IBEW v. Wal-Mart Stores, Inc.*, 7779-CS (Del. Ch. Oct. 15, 2013) (ORDER) ("Defendant shall: . . . Collect and review data from the personal computers and devices of all Custodians."). Then-Chancellor Strine's ruling in *Wal-Mart I* did not announce a *per se* rule that directors' personal emails always are subject to discovery under Section 220; rather, it left open the possibility that, depending on Wal-Mart's policy for use of company information and documents on non-company devices, information residing in the directors' personal computers may or may not have to be produced. *Wal-Mart I*, at 97-98. Furthermore, while the Delaware Supreme Court affirmed then-Chancellor

13

conclude that personal documents of the Non-Employee Directors were within the scope of Plaintiffs' Section 220 inspection right, I would have to do so based on a careful review of the circumstances of the case, and in particular the facts relating to whether the sought-after documents are within lululemon's "possession, custody, or control."[36] But, the factual record as to that issue contains no evidence on which this Court could rely in ordering the type of discovery Plaintiffs seek. I decline, in light of the incomplete record before me, to address this issue further, except to note that I reject Plaintiffs' suggestion that Delaware law requires me to order the search that they seek by this motion.[37]

The issue of whether the Non-Employee Directors' personal emails are within the "control" of the Company for purposes of Section 220 ultimately is immaterial to my decision, however, because I deny that aspect of Plaintiffs' motion on two other grounds. First, in the portions of the April 2014 Order that Plaintiffs invoke as supporting their argument in this regard, I explicitly ordered *the Company* to produce documents responsive to the specified requests to the extent they fell within a prescribed time

---

Strine's judgment *en toto*, the specific issue of whether Section 220 reaches directors' personal documents was not briefed or argued by the parties on appeal.

[36] *Saito*, 806 A.2d at 115; *see also Weinstein Enters., Inc.*, 870 A.2d at 507-12 (discussing "control" for purposes of Section 220); *id.* at 510 ("[T]he inquiry in each specific case is not whether the parent has the power to control the affairs of the subsidiary, but whether by exercising actual control, the parent corporation alone can cause the subsidiary to produce its documents."); *accord Wal-Mart I*, at 97-98.

[37] Pls.' Reply Br. 1-4.

14

period.[38] I observed that "I would not be surprised that there are no documents in this category," and did not suggest that Plaintiffs would be entitled to another, broader search for documents if that turned out to be true.[39]

By requesting production of "all communications authored or received by any Board member (including e-mails located in non-Company e-mail accounts) concerning any inquiry or investigation into Wilson's June 2013 trades," Plaintiffs ask the Court to go considerably beyond the scope of relief granted in the April 2014 Order. In that regard I note that the Section 220 demands that I considered in issuing the April 2014 Order required that the Company produce "All *documents* concerning Mr. Wilson's trades . . ." and "All *documents* concerning any investigation or inquiry" by any Board member into Wilson's trading.[40] The term "documents" was defined vaguely, at least with respect to the source of the documents sought.[41] Plaintiffs did not address squarely

---

[38]  April 2014 Order 41 ("*The Company*, however, need only produce documents from June, 2013 . . ."); *id.* at 42 ("I . . . order it to be produced by *the Company*.") (emphases added).

[39]  *Id.* at 42. The Company in fact did produce at least a few documents in this category, including, for example, an email from Nicholas, in-house counsel for lululemon, to Director Michael Casey. Company Production at lulu000037. That email, copying Chief Compliance Officer John Currie, provided Casey with information about Wilson's June 2013 trades, the Trading Plan, and the impending WSJ article. *Id.*

[40]  Pls.' Opening Br. Ex. F. ("LDC's Demand Letter"); *see also* April 2014 Order 40-42.

[41]  LDC's Demand Letter 1 n.1 ("The term 'documents' as used herein is to be construed as broadly as possible under the Rules of the Delaware Court of Chancery, and includes, without limitation, any and all correspondence concerning

15

the issue of ordering the Company to search the Non-Employee Directors' non-Company email accounts, if in fact they contemplated such a search at that time. Nor was that issue squarely raised in Plaintiffs' pre-trial papers,[42] or during the trial and related arguments in February 2014.[43] Thus, when the Court granted Plaintiffs' demands in the April 2014 Order, it did so only with respect to the issue of what documents, if any, *the Company* must produce. Plaintiffs now ask the Court to expand the scope of the April 2014 Order to include documents, if any exist, that *the Non-Employee Directors* must produce. In the circumstances of this case, I find such a retroactive expansion to be unwarranted. Because it was Plaintiffs' burden to establish by a preponderance of the evidence that each book or record sought was essential to their proper purpose,[44] I decline at this late stage to resolve any remaining ambiguity in Plaintiffs' favor.

Second, and more importantly, even if Plaintiffs properly had framed the issue of whether the Non-Employee Directors' personal emails should be within the scope of relief ordered under Section 220, Plaintiffs likely would have failed to establish that those communications were "essential" to their proper purposes of investigating potential *Brophy* claims against Wilson and potential mismanagement claims against the Board. In finding the latter purpose "proper" under Section 220, I stated that "it is legitimate for

---

the demanded categories, whether sent via mail, facsimile, electronic communication, or otherwise.").

[42] Pls.' Opening Pre-Trial Br. 13-16.

[43] Trial Tr. 22-23.

[44] *Espinoza II*, 32 A.3d at 374; *see also id.* at 374 n.19.

16

Plaintiffs to want to understand what, if [any], steps the company's board took to determine whether the sales were made in accordance [with] the Trading Plan or otherwise consistent with the Company's policies regarding insider trading."[45]

"Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[46] As noted above, a copy of the Trading Plan was in the possession of the Company, and each time stock was sold pursuant to the Plan, a notification was sent to lululemon and to Wilson's Family Office. I deem the "crux" of Plaintiffs' proper purpose, therefore, to be whether any Director contacted someone at the Company to investigate possible insider trading by Wilson. To the extent a director communicated by email or otherwise with lululemon employees, those communications would have been produced by the Company. Indeed, as noted above, at least some such communications were produced.

Apparently finding those documents insufficient, Plaintiffs seek by this motion to obtain email communications solely between or among Non-Employee Directors, occurring on non-Company accounts. While such discussions among members of the Board might be interesting to Plaintiffs, and may be helpful in a later action against those Board members, they are not "necessary" for Plaintiffs' proper purpose here. It is not enough for Plaintiffs to voice their dissatisfaction with the responsive documents located

---

[45] April 2014 Order 29.

[46] *Wal-Mart II*, 95 A.3d at 1271 (quoting *Espinoza II*, 32 A.3d at 371-72).

17

and produced by the Company in this regard. Rather, their burden under Section 220 is to show that the intra-Board communications occurring exclusively on non-Company email accounts would be necessary and essential to their investigation of potential claims against Wilson or other Board members; that is, Plaintiffs must show that they cannot accomplish their investigatory purpose without access to those emails.

Even setting aside that Plaintiffs failed to create a record sufficient to satisfy their burden as to that issue at trial, the results of the Company's production demonstrates the opposite of what Plaintiffs needed to show: that the Non-Employee Directors' personal emails are *not* necessary and essential to accomplish their proper purpose. The books and records related to the crux of Plaintiffs' proper purpose consisted of the Trading Plan, and any inquiries by members of the Board relating to an investigation of possible insider trading. On the facts of this case, an email exchange solely between Non-Employee Directors would not constitute an "investigation," if that communication never progressed to the further step, for example, of contacting someone at the Company, such as an employee responsible for compliance or legal affairs at the Company. But, any director communication rising to the level of an "investigation" in that sense presumably would have found its way to the inbox of a Company email account and onto its server. In that case, the document should have been located by lululemon or its counsel and either produced or included on a privilege log. Plaintiffs already obtained documents of that nature from the Company, so I consider it neither necessary nor essential to broaden the scope of relief granted by re-writing the April 2014 Order to include a substantially new and different search for books and records.

18

### III.    THE WSJ EMAIL AND THE NICHOLAS EMAIL

Plaintiffs contend that they are entitled to review the WSJ Email Chain and Nicholas Email because either: (1) they were improperly designated as privileged; or (2) under *Garner*, they should have access to those documents regardless of privilege. For the reasons that follow, I conclude that the WSJ Email Chain and the Nicholas Email were properly designated as privileged, and that privilege was not waived as to either. After considering the relevant factors, however, I conclude that Plaintiffs have shown good cause to access those documents under the fiduciary exception as articulated in *Garner* and *Wal-Mart*.

### A.    Whether the Nicholas Email and the WSJ Email Chain Were Properly Designated as Privileged

#### 1.    Legal Standard

Before analyzing whether Plaintiffs may review the privileged documents under *Garner*, I must decide whether the WSJ Email Chain and the Nicholas Email were properly designated as privileged.[47] Delaware Rule of Evidence 502(b), which governs the attorney-client privilege, provides:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the

---

[47]    *See Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *7 (Del. Ch. Jan. 23, 2004) (making privilege determination before deciding whether the plaintiffs had a proper purpose under Section 220 to review the document).

19

client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client. [48]

### 2. The Nicholas Email is protected by attorney-client privilege.

Plaintiffs argue that the Nicholas Email is not privileged because Nicholas, who is both the company's in-house counsel and its corporate secretary, was not acting as an attorney when she sent it. In her email, Nicholas apparently answered an inquiry from Director Stritzke regarding whether Wilson's trades complied with Wilson's Trading Plan. Generally, when an attorney has more than a legal role with the company, her communications will be privileged only if the legal aspects of the communication predominate. [49]

Based on the description in the privilege log, [50] I conclude that the Nicholas Email is privileged. Stritzke emailed Nicholas asking her to review a legal document (the Trading Plan) and tell him whether certain acts complied with it. No non-attorney employees of the Company were involved in the email chain, nor is there any reason based on the log's description to think that Stritzke or Nicholas were discussing anything

---

[48] D.R.E. 502(b).

[49] *MPEG LA, L.L.C. v. Dell Global B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013).

[50] Privilege Log ("Email reflecting legal advice regarding inquiry relating to Rule 10b5-1 plans and trade made by Mr. Wilson's broker pursuant to his Rule 10b5-1 plan.").

20

other than predominately legal issues. Such a communication is protected by attorney-client privilege.[51]

### 3. The Company did not waive privilege as to the WSJ Email Chain.

Plaintiffs also argue that the WSJ Email Chain improperly was withheld as privileged. The participants in the WSJ Email Chain included, among others, Wilson and Tina Swinton, the CFO of the Wilson Family Office. At argument, lululemon represented that the communications were related to ensuring that the coordinated statement to the WSJ was "legally accurate."[52] Plaintiffs do not dispute that the WSJ Email Chain contains legal advice, which generally is protected by attorney-client privilege. Instead, they contend that lululemon waived the privilege when it included Wilson and Swinton on the WSJ Email Chain. Lululemon responds that privilege was not waived because Wilson and lululemon had a common legal interest in responding to the WSJ inquiry. Lululemon further argues that because it and Wilson, the Chairman of its Board, had a common interest in these communications, sharing privileged materials with Wilson's agent, Swinton, also did not waive privilege.

#### a. Wilson and lululemon had a common interest.

As a general rule, disclosing privileged communications to a third party will waive privilege. One exception to that rule involves situations where a lawyer represents more

---

[51] Plaintiffs urge me to review the Nicholas Email *in camera*. *In camera* review, however, is unnecessary here because the nature of the Nicholas Email and the related privilege log description of it do not give me a reason to doubt the privileged nature of that communication.

[52] Arg. Tr. 56.

21

than one client, or two lawyers represent different clients in a "matter of common interest."[53] Delaware Rule of Evidence 502 extends the privilege to confidential communications made for the purpose of "facilitating the rendition of professional legal services to the client . . . by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest."[54] The so-called common interest doctrine, however, does not require that the relevant advice be relayed through attorneys; instead, privilege will survive when persons with a common interest share the privileged information.[55] For the parties to have a "common interest," the "interest must involve primarily legal issues, rather than relate to a common interest in a commercial venture."[56] In addition, the disclosure must have been made "to facilitate the rendition of legal services."[57] The party claiming privilege has the burden of demonstrating a common legal interest.[58]

---

[53] D.R.E. 510(a); *see also In re Quest Software Inc. S'holders Litig.*, 2013 WL 3356034, at *4 (Del. Ch. July 3, 2013).

[54] D.R.E. 502(b).

[55] *Rembrandt Techs., L.P. v. Harris Corp.*, 2009 WL 402332, at *8 ( Del. Ch. Feb. 12, 2009) ("The Court finds that separately represented clients sharing a common legal interest may, at least in certain situations and under close supervision of counsel, communicate directly with one another regarding that shared interest.").

[56] *In re Quest Software Inc.*, 2013 WL 3356034, at *4.

[57] *Id.* (internal quotation marks omitted).

[58] *Id.* (footnote omitted).

22

In arguing against application of the common interest doctrine, Plaintiffs rely primarily on *Titan Investment Fund II, LP v. Freedom Mortgage Corp.*[59] and argue that lululemon and Wilson did not share a common legal strategy.[60] The *Titan* decision involved two parties negotiating at arm's length over the terms of a potential agreement to provide joint financing to a third party. During the negotiations, privileged communications were shared between the two parties. When the third party sought discovery of the shared communications, the court examined whether the communications were saved from waiver because of the common-interest doctrine. The court concluded that the two parties did not have a common interest because: (1) their interests were adverse for purposes of negotiating a commercial transaction; (2) they failed to assert any "clear legal interest that is inherently related to [the] commercial objective";[61] and (3) nothing in the record suggested they anticipated becoming parties to litigation at the time they were sharing legal advice.

In this case, lululemon and Wilson were not adversaries negotiating an arm's-length transaction. Rather, they were attempting to coordinate a statement after the *Wall Street Journal* raised questions about the propriety of Wilson's trades. Faced with questions of potential wrongdoing, lululemon and Wilson shared privileged

---

[59]    2011 WL 532011 (Del. Super. Feb. 2, 2011).

[60]    Pls.' Reply Br. 12 (quoting *Titan*, 2011 WL 532011, at *5).

[61]    *Titan*, 2011 WL 532011, at *5 ("In other words, [any shared interest] was designed to further a commercial transaction and did not further a common legal strategy.").

communications for the purpose of furthering the common legal strategy of responding to the inquiry within the parameters of the securities laws and in the reasonable anticipation that litigation might ensue in which the content of their responses might be subject to scrutiny. Thus, to the extent their objectives overlapped, it was due primarily to their common *legal*, as opposed to commercial, interest. I conclude, therefore, that lululemon has satisfied its burden of showing a common interest sufficient to support its claim of privilege as to the WSJ Email Chain.

**b.      The Company did not waive privilege by including Swinton on the WSJ Email Chain.**

Because Wilson and lululemon had a common legal interest, any disclosure of the communication to Swinton would not be a waiver of privilege because Swinton was Wilson's representative. By its terms, Delaware Rule of Evidence Rule 502(b) extends the protections of attorney-client privilege to confidential communications made for the purpose of facilitating the rendition of professional legal services to the client that are sent to or from the client's representative. Rather than defining the term "client's representative," the drafters of the Delaware Rules of Evidence instead elected to let the case law develop its definition.[62] Courts have held that a "privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation."[63] Here, under the

---

[62]   D.R.E. 502 cmts. ("U.R.E. 502(a)(4) was not adopted in Delaware. It was believed that a definition of a representative of a client should be left to case law.").

[63]   *Rembrandt*, 2009 WL 402332, at *8 (internal quotations omitted).

Trading Plan, Swinton received notifications from Merrill Lynch every time there was a trade.[64] Moreover, even though Merrill Lynch apparently had sole discretion to sell Wilson's lululemon stock under the Plan, Swinton, as one of the agents in charge of Wilson's Family Office, had responsibility over matters relating to Wilson's trading activity generally. In that respect, the subject matter of the WSJ Email Chain, Wilson's Trading Plan and whether the sales complied with it, generally falls within Swinton's area of responsibility. As Wilson's agent for the Trading Plan, Swinton received privileged advice regarding the Plan and the particular trades in question that appears to have been directed toward crafting a coordinated response to the *Wall Street Journal* inquiry. Thus, I conclude that inclusion of Swinton on the WSJ Email Chain did not waive privilege as to that document.

## B. Whether the Privileged Documents Must Be Produced Under *Garner*

Although both the Nicholas Email and the WSJ Email Chain are privileged, Plaintiffs still may be able to compel production of those documents under the fiduciary exception to privilege as articulated in cases like *Garner* and *Wal-Mart II*.[65]

---

[64] *See* Company Production at lulu 000046 (authorizing Merrill Lynch to notify Swinton under the Trading Plan).

[65] Plaintiffs failed to argue in their opening brief that they were entitled to access the Nicholas Email and the WSJ Email Chain, even if they were privileged, under the *Garner* test. Instead, after the Supreme Court in *Wal-Mart II* adopted *Garner* for Section 220 actions, Plaintiffs raised the issue for the first time in their reply brief. As a general rule, the failure to raise an argument in an opening brief constitutes a waiver of that argument. *E.g.*, *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *2 n.3 (Del. Ch. Feb. 10, 2015). As Defendants correctly point out, there were previous cases from the Court of Chancery that applied *Garner* to Section 220

25

### 1.     Legal Standard

In *Wal-Mart II*, the Delaware Supreme Court for the first time applied the *Garner* exception in a Section 220 action.  *Garner* is a decision from the United States Court of Appeals for the Fifth Circuit that elucidated the "good cause" standard for determining when a stockholder should have access to corporate communications protected by attorney-client privilege under the fiduciary exception.[66]   Underlying the fiduciary exception is the importance of "balanc[ing] the legitimate assertion of the attorney-client privilege by corporate fiduciaries in furtherance of full and frank communications with counsel on the one hand, with the right of a [stockholder] to discover what advice was given . . . when a breach of duty by those same fiduciaries is alleged."[67]  *Garner* itself enumerated a number of factors that illustrate "good cause" to set aside privilege.  The Supreme Court in *Wal-Mart II* adopted and applied that analysis, identifying the following as relevant factors:[68]

---

actions, including *Grimes v. DSC Communications Corp.*, 724 A.2d 561 (Del. Ch. 1998), which the Supreme Court in *Wal-Mart II* cited with approval. Nevertheless, because the Supreme Court adopted *Garner* for the first time before Plaintiffs filed their reply brief and lululemon had an opportunity to respond to the new argument at length by letter, I deem it appropriate to consider the *Garner* argument here.

[66]     *See In re Fuqua Indus., Inc.*, 2002 WL 991666, at \*3 (quoting *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970)).

[67]     *In re Fuqua Indus., Inc.*, 2002 WL 991666, at \*3.

[68]     *See Wal-Mart II*, 95 A.3d at 1278–80.  In earlier cases, this Court had suggested that only a subset of *Garner*'s nine factors were relevant in the Section 220 context.  *See Espinoza v. Hewlett-Packard Co.*, C.A. No. 6000-VCP, at 19 (Del. Ch. Mar. 25, 2011) (TRANSCRIPT) [hereinafter "*Espinoza I*"], *aff'd on other*

26

[1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication is of advice concerning the litigation itself; [7] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and [8] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[69]

For purposes of applying the *Wal-Mart* and *Garner* analysis to this case, lululemon has conceded that Plaintiffs have a large enough stake in the Company and are not "blindly fishing."[70] In addition, lululemon does not argue that the privileged documents are trade secrets or that Plaintiffs lack a proper purpose. Thus, I focus on the extent to which Plaintiffs have shown that any of the remaining elements from the quoted excerpt—*i.e.*, numbers (3) through (6)—apply here. In conducting that analysis, I note that the plaintiff

---

*grounds*, *Espinoza II*, 32 A.3d 365 (Del. 2011); *Grimes*, 724 A.2d at 568 (citing *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 1987 WL 12500, at *4 (Del. Ch. June 19, 1987)).

[69] *Wal-Mart II*, 95 A.3d at 1276 n.32 (citing *Garner*, 430 F.2d at 1104).

[70] Def.'s Sur-reply Ltr. 7 n.4.

stockholder has the burden of showing "good cause,"[71] and that the fiduciary exception "is narrow, exacting, and intended to be very difficult to satisfy."[72]

### 2. The *Garner* factors suggest Plaintiffs are entitled to the Nicholas Email and the WSJ Email Chain

Here, Plaintiffs argue that, even if the WSJ Email Chain and the Nicholas Email are privileged, they are entitled to access those documents under the fiduciary exception as recognized in *Wal-Mart II* and *Garner*. Based on the following analysis, I agree.

### a. Are Plaintiffs' claims "obviously colorable"?

In *Wal-Mart II*, the Supreme Court affirmed then-Chancellor Strine's order to produce books and records related to the Wal-Mart board's investigation into alleged bribery of Mexican officials by one of Wal-Mart's subsidiaries. In so doing, the Supreme Court concluded that an "obviously colorable" bribery allegation could support, in part, a finding of "good cause" under *Garner*, even though the Section 220 production related to the subsequent investigation, rather than the alleged bribery itself.[73] In this case, I construe the "obviously colorable" aspect of the analysis as requiring Plaintiffs to show either that the underlying *Brophy* claim against Wilson is obviously colorable, or that the mismanagement claim—relating to the Board's subsequent investigation, or lack thereof, into possible insider trading—is obviously colorable.

---

[71] *E.g.*, *Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *7 (Del. Ch. Jan. 23, 2004).

[72] *Wal-Mart II*, 95 A.3d at 1278.

[73] *See Wal-Mart II*, 95 A.3d at 1279.

Under Section 220, the Court looks to whether the stockholder has a proper purpose; that is, when investigating corporate wrongdoing, whether there is a credible basis to infer that wrongdoing may have occurred.[74] While not an inconsequential standard, a "credible basis" is "the lowest possible burden of proof."[75] The facts relating to Wilson's trading support an obviously colorable *Brophy* claim, at least at this procedural stage. As I noted in connection with the April 2014 Order: (1) Wilson was one of the few people who knew that lululemon's CEO was going to resign; (2) the magnitude and the timing of Wilson's June 7, 2013 trades were highly suspicious; and (3) Wilson hit his one-million-share-per-month cap only seven days into June.[76] Plaintiffs' mismanagement claim similarly was obviously colorable in the sense that they had reasonable suspicion about the trades, and were justified in seeking books and records relating to what, if anything, the lululemon directors did to ensure that those trades were

---

[74] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122-23 (Del. 2006).

[75] *Id.* at 123. Plaintiffs initially contended that showing a credible basis was sufficient for *Garner*'s "obviously colorable" element. Pls.' Reply Br. 6 ("In light of the fact that in its [April 2014] Order this Court determined that Plaintiffs have stated a proper purpose and that the categories of documents sought in the demand (and limited slightly by the Court) are 'necessary and essential' to that purpose, there can be little doubt that Plaintiffs have stated a colorable claim."). At the Argument, however, they conceded that "credible basis" and "obviously colorable" likely were two different standards. Arg. Tr. 20–23. I need not determine the congruence or difference between those standards, however, because I find Plaintiffs' claims to be "obviously colorable."

[76] Arg. Tr. 21–23.

lawful and in accordance with Company policy. Thus, Plaintiffs have alleged obviously colorable claims for *Garner* purposes.

> **b.** **Are the communications necessary and unavailable from other sources?**

As previously discussed, courts in a Section 220 action order the production only of books and records that are necessary and essential to the stockholder's proper purpose. The Supreme Court articulated this aspect of the *Garner* inquiry as whether "[the documents] address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[77] In determining whether the fiduciary exception to privilege applies, courts look to "the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources."[78] I consider the necessary and essential prong for Section 220 to be similar, if not identical, to this aspect of the *Garner* analysis.

Under *Garner*, courts have found that privileged documents are not necessary and essential if the stockholder has the underlying information.[79] For example, in *Saito v. McKesson*, the company announced shortly after a merger that it had to make certain

---

[77] *Wal-Mart II*, 95 A.3d at 1271 (quoting *Espinoza II*, 32 A.3d at 371–72).

[78] *Garner*, 430 F.2d at 1104.

[79] *Espinoza I*, at 25 (finding that the stockholder had failed to show that the information from the investigative report detailing the CEO's sexual harassment was unavailable from another source when he already had the documents and information underlying the report); *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *13 (Del. Ch. Oct. 25, 2002) (finding plaintiff had failed to demonstrate the documents were necessary when he had the information underlying the legal analysis).

30

accounting restatements as a result of irregularities discovered in the target's books.[80] The stockholder sought, among other things, books and records related to legal advice given to the company's board pre- and post-merger. The Court first found that, under *Garner*, the stockholder was entitled to pre-merger legal advice to determine the information that the board had at the time it was considering the merger.[81] The Court denied, however, the plaintiff's requests for post-merger legal advice because the stockholder had the information underlying that advice.[82]

With those principles in mind, I first consider the Nicholas Email. In this regard, Plaintiffs sought documents related to their investigation of possible *Brophy* claims against Wilson and possible claims of mismanagement against the Board regarding their inquiry into the propriety of Wilson's trades. The Nicholas Email was identified on the privilege log as a responsive document, likely because it relates to an inquiry from a director regarding Wilson's trades. The Company contends, however, that because it already has produced the Trading Plan, as well as numerous related documents and communications, production of the Nicholas Email is unnecessary. In addition, counsel

---

[80]     *Saito*, 2002 WL 31657622, at *1–2.

[81]     *Id.* at *13 ("Plaintiff's purpose, however, is to determine what the board knew when approving the merger. The legal advice given to the board in conjunction with the merger is relevant and necessary in determining what information the board relied upon.").

[82]     *Id.* at *14 ("Plaintiff has obtained the necessary underlying information through documents previously provided to him by defendant during discovery. Plaintiff does not have a right to defendant's legal analysis of that same information.").

31

for the Company has stated that Plaintiffs have all of the information underlying the Nicholas Email.[83]

The content of Director Stritzke's communication to the individuals at the Company who would be in charge of compliance and other legal issues, however, goes directly to the crux of Plaintiffs' proper purpose, especially as it relates to the Board's investigation into Wilson's trading. Indeed, part of my determination as to whether Plaintiffs should have access to the Non-Employee Directors' private email accounts was that any communication between or among Board members that reasonably could be called an "investigation" would have touched at some point the Company's network, insofar as Company employees' email data is stored and searchable by the Company. The Nicholas Email is just that sort of communication, and I find it necessary for Plaintiffs' investigatory purpose. Based in part on my ruling as to the Non-Employees' personal email accounts, the Nicholas Email almost certainly is unavailable to Plaintiffs by any other means. Thus, this aspect of *Garner* cuts in favor of setting aside privilege as to the Nicholas Email.

Second, I find that the WSJ Email Chain also is necessary for purposes of this element of the *Garner* analysis, although it presents a much closer question than the Nicholas Email. In this regard, Plaintiffs seek communications, including legal advice, underlying the coordinated response of Wilson and the Company to the *Wall Street Journal* article. Based on the production already made by the Company, Plaintiffs

---

[83] Arg. Tr. 41.

evidently have at least some of the information underlying WSJ Email Chain—*i.e.*, the Trading Plan, the statement reflecting the June 7 trade itself, and related documents and communications. On the other hand, lululemon did not make a statement in response to the WSJ inquiry, and Plaintiffs do not know what, if anything, lululemon's counsel told Wilson, his representatives, or his attorneys in this regard, or what other information Nicholas may have had regarding the Wilson June 7 trades.

Having considered these circumstances, I consider the WSJ Email Chain, including the legal advice contained in it, to be directly related to Plaintiffs' proper purpose of investigating their potential *Brophy* claim against Wilson and their potential claim of mismanagement against the Directors. As to whether Plaintiffs already have all the underlying information pertaining to the WSJ Email, the record is less clear. To the extent they do not, it is unlikely the missing information would available from any other source. Thus, while this element of the *Garner* analysis does not cut as strongly in favor of lifting the privilege as it did in the case of the Nicholas Email, I conclude that it weighs slightly in favor of production.

### c. Does the alleged wrongdoing constitute a criminal act?

Lululemon argues that in light of the existence of the Trading Plan, which now has been produced, "Plaintiffs cannot credibly allege that any criminal or illegal acts occurred."[84] While lululemon repeatedly avers that the Trading Plan conclusively demonstrates that no insider trading took place, such a conclusion would be premature

---

[84]     Def.'s Sur-reply Ltr. at 16.

based on the truncated record before me. While the Trading Plan may weigh against a finding that insider trading occurred, and, indeed, ultimately might absolve Wilson of liability, its mere existence and the fact that its mechanics literally may have been adhered to do not, in and of themselves, preclude insider trading. It remains conceivable that Wilson or someone else associated with Wilson or the Company may have tipped off the broker handling the Trading Plan and thereby engaged in wrongful trading. The suspicious nature of the timing and size of the June 7, 2013 trade still remains. In sum, the claims that provided the foundation of Plaintiffs' proper purpose in this case stem from an underlying allegation of criminal conduct, namely insider trading; therefore, this element of *Garner* is satisfied.

### d. Do the communications relate to advice concerning this litigation?

Under *Garner* the courts look to whether the evidence sought relates to advice about the present litigation itself, or instead to the underlying events and conduct that gave rise to the plaintiffs' proper purpose. According to *Wal-Mart II*, setting aside privilege is more justified in the latter situation than the former.[85] This aspect of the analysis is not applied rigidly, however, and depends on the specific facts of the case.[86] For example, in *Espinoza v. Hewlett-Packard Co.*, after the CEO was investigated for

---

[85] *Wal-Mart II*, 95 A.3d at 1280 ("'[As to] whether the communication is advice concerning the litigation itself, no, this is not after those litigations. So I don't think it's trying to get into [advice about] how to defend against what the plaintiffs are doing. This is during the real-time of Wal-Mart dealing with this thing.'") (quoting *Wal-Mart I*, at 86.).

[86] *Espinoza I*, at 21.

possible sexual harassment, he resigned with severance pay rather than risk being fired for cause. A stockholder then sought the company's books and records to investigate whether the severance package the company paid to the exiting CEO constituted waste. In analyzing the *Garner* factors to determine if good cause existed to set aside privilege as to an interim report by the company's outside counsel investigating the alleged sexual harassment, this Court considered the document to be related to legal advice about the litigation itself, even though aspects of the report obviously dealt with the underlying facts and events that preceded the litigation.[87] Similarly, in *Saito*, this Court denied the stockholder's request for post-merger advice based in part on finding that it related to the litigation itself.[88] In that regard, the Court concluded that "[the company's] legal analysis is also related to the litigation at hand. The improprieties at issue were discovered post-merger. At that point, defendant obtained legal advice to prepare for the ensuing litigation. To grant plaintiff access to this information, in my opinion, would be improper."[89]

In this case, it does not appear that this factor weighs against application of the fiduciary exception. Plaintiffs seek privileged communications relating to legal advice

---

[87]  *Id.* I note that this element of the *Garner* analysis was not emphasized in the circumstances of the *Espinoza* case, which relied more heavily on the "necessity" element of *Garner* in determining that the privilege should be protected there. *Id.* at 21-24.

[88]  *Saito*, 2002 WL 31657622, at *14.

[89]  *Id*.

given to the Company almost immediately after the suspicious trading was discovered. The legal advice contained in the Nicholas Email and the WSJ Email Chain was given to help the Company determine the appropriate legal response to that revelation. It is possible that the participants in the privileged communications at issue contemplated the potential of litigation; indeed as I noted above, that is part of the reason these communications are privileged. But, I consider these two sets of documents to be more analogous to the "real-time" evidence that the Court in *Wal-Mart II* found to be subject to the *Garner* exception than to either the *Espinoza* or the *Saito* situations.[90] I therefore conclude that this part of the *Garner* test weighs at least slightly in favor of allowing Plaintiffs to view the documents notwithstanding the privilege.[91]

### e. On balance, the *Garner* factors weigh in favor of allowing Plaintiffs to view the challenged documents.

The *Garner* decision focused on the equitable concerns implicated in a situation "where the client asserting the privilege is an entity which in the performance of its functions acts wholly or partly in the interests of others, and those others, or some of them, seek access to the subject matter of the communications."[92] In so doing, *Garner*

---

[90] *Wal-Mart II*, 95 A.3d at 1280.

[91] I consider this factor of the analysis to distinguish between: (1) communications about the "present litigation itself" (*Espinoza I*, at 21), or advice about "how to defend against what the plaintiffs are doing" (*Wal-Mart II*, 95 A.3d at 1280); and (2) communications that might relate to a non-specific contemplation of future litigation. The Nicholas Email and the WSJ Email Chain fall more in the latter category and, therefore, are more likely to be subject to the fiduciary exception.

[92] *Garner*, 430 F.2d at 1101.

was respectful of the importance of protecting the attorney-client privilege, but also cognizant of an important precept of corporate law, which is that "when all is said and done management is not managing for itself."[93]

Thus, while *Garner* and *Wal-Mart II* enumerate a "panoply of factors"[94] that courts should consider in determining whether stockholder plaintiffs have "good cause" to set aside attorney-client privilege under the fiduciary exception, I decline to apply those factors mechanically. Instead, I have reviewed all of the factors and, cognizant of the principles on which the fiduciary exception is founded, considered whether or not their cumulative weight tends toward a showing of "good cause" to access the withheld documents.

The Company conceded that the documents sought are identifiable and limited in number; that Plaintiffs are substantial stockholders; that Plaintiffs have a proper purpose under *Garner*; and that the communications did not involve trade secrets. In the preceding analysis, I found that Plaintiffs' claims of alleged wrongdoing are obviously colorable. Moreover, the documents Plaintiffs seek in this regard do not relate to the present litigation, but rather to the real-time events underlying the action that gave rise to Plaintiffs' proper purpose. I also found that the Nicholas Email and to a lesser extent the

---

[93] *Id.*; *see also Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ("[C]orporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders.") (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

[94] *Wal-Mart II*, 95 A.3d at 1279.

WSJ Email Chain are necessary to Plaintiffs and unavailable from another source. Furthermore, no one factor predominates under the *Garner* analysis. Rather, the various elements are "indicia that may contribute to a decision of presence or absence of good cause."[95] Taking into consideration all the *Garner* factors, the particular circumstances of this case, and the relevant case law, I conclude that Plaintiffs have met their burden of showing good cause. I hold, therefore, that Plaintiffs are entitled to review the Nicholas Email and the WSJ Email Chain under *Garner*'s fiduciary exception to privilege.

## IV.  CONCLUSION

For the reasons stated in this Memorandum Opinion, I deny Plaintiffs' motion in part and grant it in part. I decline to order lululemon to search its directors' non-Company email accounts. I grant Plaintiffs' request to review the WSJ Email Chain and the Nicholas Email, because they have demonstrated good cause under *Garner* and *Wal-Mart II*. Those documents shall be produced within five business days of the date of this Memorandum Opinion.

**IT IS SO ORDERED**.

---

[95]     *Garner*, 430 F.2d at 1104.